# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 34873

| | | |
|---|---|---|
| **BANNER LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **THE MARK WALLACE DIXSON IRREVOCABLE TRUST; and TAMMIE SUE DIXSON, individually,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| ---------------------------------------------------------- | ) | **Boise, February 2009 Term** |
| **THE MARK WALLACE DIXSON IRREVOCABLE TRUST,** | ) ) | |
| | ) | **2009 Opinion No. 47** |
| **Cross Claimant-Respondent,** | ) | |
| | ) | **Filed: April 3, 2009** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| **TAMMIE SUE DIXSON,** | ) | |
| | ) | |
| **Cross Defendant-Appellant.** | ) | |
| ---------------------------------------------------------- | ) | |
| **TAMMIE SUE DIXSON,** | ) | |
| | ) | |
| **Third Party Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **ROBERT and JACKIE YOUNG,** | ) | |
| | ) | |
| **Third Party Defendants.** | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Honorable Thomas A. Neville, District Judge.

Orders granting summary judgment and costs are <u>vacated</u> and the case is <u>remanded.</u>

Finch & Associates Law Office, P.A., Boise, and Ellsworth, Kallas, Talboy & DeFranco, P.L.L.C., Boise, for appellant. Robert W. Talboy argued.

1

Cosho Humphrey, LLP, Boise, for respondent. Mackenzie Whatcott argued.

_____

J. JONES, Justice

Tammy Dixson and The Mark Wallace Dixson Irrevocable Trust filed competing claims to the proceeds of a term life insurance policy insuring the life of Tammy's deceased husband, Mark Dixson. The insurance company, Banner Life Insurance Company (BLI), filed a complaint for interpleader asking the district court to resolve the competing claims. Tammy and the Trust subsequently filed cross-motions for summary judgment contesting the character of the policy proceeds and Mark's designation of beneficiaries. The district court granted the Trust's motion for summary judgment, denied Tammy's motion, and awarded the Trust costs and fees. Tammy now appeals the district court's orders. We vacate and remand.

## I.

Tammy[1] Sue Dixson and Mark Wallace Dixson were married on January 1, 2000. While married to Tammy, Mark obtained an annual renewable term life insurance policy in the amount of $300,000.00 from BLI. Initially, Mark designated Tammy as the sole beneficiary of the policy.

In September 2003, Mark was diagnosed with Amyotrophic Lateral Sclerosis (ALS), or Lou Gehrig's disease. As a result of the ALS, Mark's physical condition began to deteriorate and he eventually required skilled nursing care. Consequently, Mark was admitted into the Life Care Center of Treasure Valley (LCC) in December 2004. While at LCC, Mark's health continued to decline, resulting in hampered motor and verbal communication skills.

After being diagnosed with ALS, Mark's financial situation also worsened. Eventually, Mark became unable to pay the premiums on his life insurance policy. When Mark confided his inability to pay the premiums to the Dixsons' family home teacher,[2] Cory Armstrong, Armstrong offered his financial assistance. Armstrong subsequently paid the policy premiums for the years 2005 and 2006.

In addition to their financial problems, the Dixsons' marriage became increasingly strained. On January 31, 2005, acting without Tammy's consent, Mark signed a beneficiary

_____

[1] Tammy is referred to in the record as "Tammie," however, she points out in her brief on appeal that her name is actually spelled "Tammy."
[2] The record shows that a home teacher is "a teacher of faith within the Church of Jesus Christ of Latter Day Saints."

2

change form removing Tammy as the beneficiary of the policy. The form named Mark's mother, Jackie Young, as the primary beneficiary and his stepfather, Robert Young, as the contingent beneficiary. Mark's recreational therapist, Canyin Barnes, witnessed the execution of the beneficiary change form. Although Ms. Barnes mailed the form to BLI, it is unclear whether BLI ever received the form.

That same day, Mark also executed a durable power of attorney designating Jackie, Robert, and his brother, David Dixson, as his attorneys-in-fact. Mark granted these agents the authority "[t]o exercise or perform any act, power, duty, right or obligation whatsoever" on his behalf. He also authorized them to make gifts of his property and engage in self-dealing without such acts being considered breaches of their fiduciary duty. The power of attorney form was initialed by Mark and notarized by Kaye Baker, an employee of LCC.

Approximately eight months later, on August 18, 2005, Mark filed a complaint for divorce against Tammy. After the complaint was filed, the magistrate court issued a joint temporary restraining order so as "to maintain the status quo" of the couple's property. Among other things, the order prohibited both parties from changing the beneficiary on any life insurance policy "held for the benefit of the parties." By its terms, the order was to remain in effect until a final order was entered on the complaint for divorce or until further order of the court. A default decree of divorce was subsequently issued on January 9, 2006, but the decree was set aside after the court determined that Tammy had not been personally served with the complaint. As a result, Tammy and Mark continued to be married and the temporary restraining order remained in effect.

On April 27, 2006, despite the existence of the temporary restraining order, Robert, acting as Mark's attorney-in-fact, executed a second beneficiary change form on Mark's behalf. The form named Jackie as the primary beneficiary of the policy and Mark's six children as contingent beneficiaries.[3] Although the beneficiary change form indicated that spousal consent was required under Idaho law, the change of beneficiary was made without Tammy's knowledge or consent. Mark's attorney faxed the form to BLI on May 2, 2006. Shortly thereafter, on May 5, 2006, Mark died from complications associated with ALS. At the time of Mark's death, he and Tammy were still married.[4]

---

[3] Mark had six children from a previous marriage.
[4] The divorce action was pending at the time of Mark's death, but was subsequently dismissed on June 19, 2006.

After Mark's death, Jackie and Tammy both filed claims to the policy proceeds. Jackie subsequently assigned her claim to "The Mark Wallace Dixson Irrevocable Trust."[5] As a result of the parties' inability to settle their dispute, BLI filed a complaint for interpleader asking the district court to resolve the competing claims to the policy proceeds.[6] The Trust filed an answer and cross-claim against Tammy alleging that she had no interest in the proceeds. It requested that the proceeds be paid to the Trust as Jackie's assignee. Tammy then filed answers to both claims and a third-party complaint against the Trust. In her complaint, Tammy asserted that she was entitled to the policy proceeds because the change of beneficiary was invalid. She requested that the Trust's claim to the proceeds be dismissed and that she be awarded costs and attorney fees. Similarly, in its answer to Tammy's complaint, the Trust asked the court to dismiss Tammy's claim. It alleged that the policy premiums were paid with Mark's separate property and, therefore, that Tammy had no legitimate claim to the proceeds. It further requested an award of costs and attorney fees. Neither party requested that the case be tried before a jury.

Tammy and the Trust subsequently filed cross-motions for summary judgment contesting the character of the policy proceeds and the validity of the designation of beneficiaries. On November 9, 2007, the district court entered an order granting the Trust's motion for summary judgment. The court reasoned that the Trust was entitled to summary judgment because the policy proceeds were Mark's separate property and Jackie was the policy beneficiary. Since Jackie had assigned her interest in the policy proceeds to the Trust, the Trust was entitled to the "entire net sum of the remaining proceeds from the life insurance policy." Accordingly, the court ordered that the proceeds and accrued interest be released to the Trust. The court subsequently granted the Trust's request for attorney fees and costs, relying on Idaho Code sections 12-120(3) and 15-8-208.

Tammy now appeals the trial court's decision granting the Trust's motion for summary judgment and denying her cross-motion for summary judgment. She also appeals the court's award of attorney fees and costs. On appeal, Tammy argues that she is entitled to the policy proceeds because the policy premiums were paid with community property, in the form of a loan from Armstrong to Tammy and Mark. She also argues that she should have been awarded the proceeds because the beneficiary changes were made without her consent and violated the joint

---

[5] Jackie created the Trust in December 2006 and designated herself as grantor and trustee. Mark's six children were named as the beneficiaries.

[6] BLI was dismissed as a party after it deposited the policy proceeds, less its costs and fees, with the court.

4

temporary restraining order.  Finally, she requests an award of costs and attorney fees on appeal.
The Trust argues that the district court's orders granting its motion for summary judgment and
awarding it costs and fees should be upheld.  It requests an additional award of fees on appeal.

## II.

We are concerned with four issues on appeal, namely, whether: (1) the district court
correctly concluded that the life insurance proceeds were Mark's separate property; (2) Mark
effectively changed the policy beneficiary; (3) the district court erred in awarding the Trust
attorney fees and costs; and (4) either party is entitled to an award of fees and costs on appeal.

## A.

On appeal from an order granting a party's motion for summary judgment, we employ
the same standard of review that the trial court uses in ruling on the motion.  *Baxter v. Craney*,
135 Idaho 166, 170, 16 P.3d 263, 267 (2000).  Summary judgment is appropriate when the
pleadings, affidavits, and discovery documents before the court indicate that no genuine issue of
material fact exists and that the moving party is entitled to judgment as a matter of law.  Idaho R.
Civ. P. 56(c); *Baxter*, 135 Idaho at 170, 16 P.3d at 267.  The moving party carries the burden of
proving the absence of a genuine issue of material fact.  *Baxter*, 135 Idaho at 170, 16 P.3d at 267.

In construing the record on a motion for summary judgment, all reasonable inferences
and conclusions must be drawn in favor of the party opposing summary judgment.  *Student Loan
Fund of Idaho, Inc. v. Duerner*, 131 Idaho 45, 49, 951 P.2d 1272, 1276 (1997).  The nonmoving
party, however, "may not rest upon the mere allegations or denials of that party's pleadings, but
the party's response, by affidavits or . . . otherwise . . . , must set forth specific facts showing that
there is a genuine issue for trial."  Idaho R. Civ. P. 56(e); *Baxter*, 135 Idaho at 170, 16 P.3d at
267.  "A mere scintilla of evidence is not enough to create a genuine issue of fact," but
circumstantial evidence may suffice.  *Tingley v. Harrison*, 125 Idaho 86, 89, 867 P.2d 960, 963
(1994); *Doe v. Durtschi*, 110 Idaho 466, 470, 716 P.2d 1238, 1242 (1986).  Still, the evidence
offered in support of or in opposition to a motion for summary judgment must be admissible.
*Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (1999).

The fact that both parties file motions for summary judgment does not necessarily mean
that there are no genuine issues of material fact.  *Moss v. Mid-Am. Fire & Marine Ins. Co*., 103
Idaho 298, 302, 647 P.2d 754, 758 (1982).  Moreover, the filing of cross-motions for summary
judgment does not transform "the court, sitting to hear a summary judgment motion, into the trier

of fact." *Id*. When cross-motions have been filed and the action will be tried before the court without a jury, however, the court may, in ruling on the motions for summary judgment, draw probable inferences arising from the undisputed evidentiary facts. *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 519, 650 P.2d 657, 661 (1982); *see also Drew v. Sorensen*, 133 Idaho 534, 537, 989 P.2d 276, 279 (1999). Drawing probable inferences under such circumstances is permissible since the court, as the trier of fact, would be responsible for resolving conflicting inferences at trial. *Ritchie*, 103 Idaho at 519, 650 P.2d at 661. Conflicting evidentiary facts, however, must still be viewed in favor of the nonmoving party. *Argyle v. Slemaker*, 107 Idaho 668, 670, 691 P.2d 1283, 1285 (Ct. App. 1984).

## B.

Tammy makes several challenges to the district court's conclusion that the policy proceeds were Mark's separate property. Initially, she argues that the trial court misconstrued the law in concluding that the source of the last premium payment controlled the character of the policy proceeds. Alternatively, she argues that genuine issues of material fact exist regarding the characterization of the 2005 and 2006 premium payments. Finally, Tammy contends that the proceeds were her separate property under Idaho Code section 41-1830.

## 1.

Tammy argues that the district court erred in concluding that the source of the last premium payment controlled the character of the policy proceeds. She maintains that the source of the last payment is irrelevant since the policy proceeds were her separate property under Idaho Code section 41-1830. The Trust argues that the district court correctly concluded that the source of the funds used to pay the last policy premium determines the character of the policy proceeds.

In Idaho, the characterization of an asset as community or separate property depends on the date and source of the property's acquisition.[7] *Estate of Hull v. Williams*, 126 Idaho 437, 440, 885 P.2d 1153, 1156 (Ct. App. 1994). Property acquired during the marriage is presumptively regarded as community property. *Stewart v. Stewart*, 143 Idaho 673, 677, 152 P.3d 544, 548 (2007). The party seeking to overcome the presumption has the burden of proving "with reasonable certainty and particularity" that an asset is his or her separate property.

---

[7] Although divorce proceedings were pending at the time of Mark's death, a final divorce decree had not been entered. Therefore, the marital community continued to exist until Mark's death and community property principles still apply. *See* I.C. § 32-601.

6

*Williams*, 126 Idaho at 441, 885 P.2d at 1157 (quoting *Houska v. Houska,* 95 Idaho 568, 570, 512 P.2d 1317, 1319 (1973)); *see also Guy v. Guy*, 98 Idaho 205, 206, 560 P.2d 876, 877 (1977). This may be accomplished "by establishing that the property was acquired by one spouse prior to the marriage, by tracing the funds used to acquire the asset to a separate property source, or by showing that the property was acquired by gift, bequest or devise during the marriage." *Williams*, 126 Idaho at 441, 885 P.2d at 1157; *see also* I.C. § 32-903. Absent such a showing, all property "acquired after marriage by either the husband or wife is community property." *Williams*, 126 Idaho at 440, 885 P.2d at 1156; *see also* I.C. § 32-906.

The classification of life insurance policies as separate or community property is somewhat more complicated. Generally, life insurance policies insuring the life of a spouse are regarded as community property when they are acquired during the marriage and the premiums are paid with community funds. *Travelers Ins. Co. v. Johnson*, 97 Idaho 336, 340, 544 P.2d 294, 298 (1975); *Anderson v. Idaho Mut. Benefit Ass'n*, 77 Idaho 373, 377, 292 P.2d 760, 762 (1956). The rule as applied to term life insurance policies, however, requires slight modification to account for the unique nature of such policies. *See Aetna Life Ins. Co. v. Wadsworth*, 689 P.2d 46, 49-50 (Wash. 1984).

Unlike whole life insurances policies, term life insurance policies only protect against the risk of the insured's death for a fixed period of time. *Id*. at 49. They do not acquire any cash surrender or loan value nor do they accumulate interest. *See, Guy*, 98 Idaho at 207, 560 P.2d at 878. If the insured does not die during the covered term, the policy loses all of its value. *Johnson*, 97 Idaho at 340, 544 P.2d at 298; *see also United Investors Life Ins. Co. v. Severson*, 143 Idaho 628, 632, 151 P.3d 824, 828 (2007). Under such circumstances "[t]he insured has had the benefit of protection for the [term] and it has been 'used up.' He must pay another premium to enjoy further protection." *Guy*, 98 Idaho at 207, 560 P.2d at 878 (quoting Comment, *Community and Separate Property Interests in Life Insurance Proceeds: A Fresh Look*, 51 WASH. L. REV. 351, 353 (1976)). This is true regardless of the "length of time the insured has had the policy and the number of premiums previously paid." *Id*.; *see also Wadsworth*, 689 P.2d at 49. Essentially, term life insurance policies are "a series of unilateral contracts, each beginning with the payment of a premium for a specified period . . . and terminat[ing] at the expiration of that . . . period." *Guy*, 98 Idaho at 207, 560 P.2d at 878.

In light of the unique nature of term life insurance policies, several community property states have adopted the risk payment theory to guide the classification of such policies. *See, e.g., Estate of Logan*, 191 Cal. App. 3d 319, 325-26 (1987); *In re Estate of Schleis*, 642 P.2d 164, 164 (N.M. 1982); *Wadsworth*, 689 P.2d at 50; *see also Guy*, 98 Idaho at 208, 560 P.2d at 879. "The risk payment theory is a functional approach which takes into account the manner in which values accrue under various types of policies." *Wadsworth*, 689 P.2d at 49. Under the theory, the character of life insurance policy proceeds is determined by the source of the funds used to pay the risk portion of the policy, which for a term life insurance policy is the last policy premium. *Id*. at 49-50. In other words, term life insurance policy proceeds are only regarded as community property when the last premium payment was made with community funds.

Although we have not specifically held that the risk payment theory governs the classification of term life insurance policy proceeds, the theory is in accord with Idaho case law. *See Guy*, 98 Idaho at 207-08, 560 P.2d at 878-79 (relying on the risk payment theory in classifying a group term disability policy as a series of unilateral contracts, the proceeds of which could not be characterized based solely on the source of the initial premium payment); *Johnson*, 97 Idaho at 340, 544 P.2d at 298 (holding that proceeds from a term life insurance policy became vested in the surviving spouse upon the insured's death because the premiums were paid with community assets); *Noyes v. Noyes*, 106 Idaho 352, 356, 679 P.2d 152, 156 (Ct. App. 1984) (holding that the community did not have an interest in proceeds from a term life insurance policy because the insured did not die during a "policy period covered by any prepayment of premiums from community funds"). Additionally, the theory is beneficial in that it accounts for the interest the community actually acquires when it makes premium payments on a term life insurance policy. *See Guy*, 98 Idaho at 207, 560 P.2d at 878 ("The risk payment doctrine correctly treats term insurance as a series of unilateral contracts, rather than as one bilateral contract." (quoting Comment, *Community and Separate Property Interests in Life Insurance Proceeds: A Fresh Look*, 51 WASH. L. REV. 351, 374 (1976))). Upon the expiration of the term paid with community assets, the community interest in the policy lapses. Only if the community pays for an additional term will it retain its interest in the policy.

For the foregoing reasons, we hold that the risk payment theory is the appropriate method for determining the character of term life insurance policy proceeds. Thus, the district court did not err in concluding that, although the policy proceeds were presumptively community property

8

since the policy was acquired during the marriage, the presumption could be overcome by a showing that the last premium was paid with Mark's separate property.

**2.**

Next, Tammy argues that the district court erred in concluding that the 2005 and 2006 policy premiums were paid with Mark's separate property. She argues she and Mark confided to Armstrong that they were unable to make the premium payments, to which he responded he would make them with the understanding he would be repaid from the death benefit. Further, she contends that the court's conclusion was erroneous because it contravened well-established principles governing rulings on motions for summary judgment. Specifically, she argues the court failed to construe the record in the light most favorable to her, the non-moving party, and improperly engaged in a weighing of the evidence. She maintains that, had the court correctly construed the record, it would have concluded the payments were made with community funds, in the form of a loan from Armstrong to the community. Alternatively, Tammy argues that even if the premium payments were gifts, they were gifts to the marital community rather than separate gifts to Mark. Any doubt as to the character of the gifts would have to be resolved against the Trust.

The Trust, on the other hand, argues that the court did not err in concluding that the 2005 and 2006 premium payments were separate gifts to Mark. According to the Trust, the district court was free to draw probable inferences from the statements in the affidavits and conclude that the payments were not made on behalf of the community. Since Tammy did not support the contrary statements in her affidavit with any evidence, the Trust maintains that it was reasonable for the court to rely on Armstrong's affidavit, which indicated that he intended the premium payments to be separate gifts to Mark. Further, the Trust contends that Tammy's understanding of the character of the premium payments is irrelevant since the donor's intent controls whether the payments constituted gifts. Because Armstrong asserted that the final payments were made as separate property gifts to Mark, the Trust argues the court properly concluded that there was no community interest in the policy proceeds upon Mark's death.

As discussed above, the party asserting a separate property interest in assets acquired during the marriage carries the burden of proving the separate character of the property. *Guy*, 98 Idaho at 206, 560 P.2d at 877. Accordingly, in order to prove that the policy proceeds were Mark's separate property, the Trust was required to show that the last premium payment was

made with separate funds. This, in turn, required the Trust to prove that the 2006 payment Armstrong made was not a loan or gift to the community, but was a separate gift to Mark. Only then could the district court properly conclude that the policy proceeds were Mark's separate property.

Under Idaho law, a "gift" is defined to mean "a voluntary transfer of property by one to another without consideration or compensation therefor." *Stanger v. Stanger*, 98 Idaho 725, 728, 571 P.2d 1126, 1129 (1977) (quoting *Wood v. Harris*, 203 P.2d 710, 712 (Okla. 1949)). To effectuate a gift, a donor must deliver property to a donee, or to someone on his or her behalf, with a manifested intent to make a gift of the property. *Boston Ins. Co. v. Beckett*, 91 Idaho 220, 222, 419 P.2d 475, 477 (1966); *Williams*, 126 Idaho at 443, 885 P.2d at 1159. Delivery is accomplished when the grantor "relinquish[es] all present and future dominion over the property." *Williams*, 126 Idaho at 443, 885 P.2d at 1159; *see also Beckett*, 91 Idaho at 222, 419 P.2d at 477. Donative intent may be proven by direct evidence, including statements of donative intent, or inferences drawn from the surrounding circumstances, such as the relationship between the donor and donee. *Williams*, 126 Idaho at 443-44, 885 P.2d at 1159-60.

Here, the district court recognized that the characterization of the policy proceeds depended on whether the final premium payment made by Armstrong constituted "a gift to the community, a gift of separate property to Mark, or . . . a loan." It then determined that the premium payments were separate gifts from Armstrong to Mark. The court reached its conclusion after determining that the Trust had proven that there was no genuine issue of material fact as to delivery or donative intent. In making its decision, the court relied on Armstrong's affidavit, which stated:

> In 2005, I paid the premium as a gift to my friend Mark as it was my understanding that Tammie [sic] had refused to pay the premium. At that time, all of Mark's mail was being delivered to him at the care center and it was my understanding that Tammie [sic] was not visiting him or taking care of his expenses. This gift to Mark was done with the understanding that Mark wanted to be sure the death benefit proceeds . . . would be available to care for his six children. . . . I also paid the premium in 2006 as a gift to Mark alone. . . . I did not intend the premium payments to be a gift to Tammie [sic] or to their community estate. My gift was to Mark alone.

Based on these statements, the court concluded that there was "strong evidence" of Armstrong's "intent to gift to Mark alone as his separate property." Further, there was nothing to

"refute[] the fact that . . . Armstrong . . . relinquished all present and future dominion and had no expectation of receiving repayment." Although Tammy's affidavit indicated that Armstrong agreed "to pay the premiums on the life insurance policy in 2005 and 2006, with the understanding that, when [Tammy] received the policy proceeds, she would repay [him]," the court dismissed Tammy's statements because they were "self-serving" and only based on Tammy's "understanding" that the payments were a loan. Since the court regarded the donor's intent as controlling in determining whether the payments constituted gifts, it concluded that it could reasonably infer that the payments made by Armstrong were separate gifts to Mark. The court then held that the Trust had proven that there was no genuine issue of material fact regarding the separate character of the policy proceeds. Any community interest in the policy had "lapsed when the community stopped making premium payments."

The district court's conclusion that there was no genuine issue of material fact as to the character of the final premium payment was erroneous. The character of the payment was a material fact that controlled the disposition of the case. Because the issue of donative intent is factual,[8] *see Stanger*, 98 Idaho at 727, 571 P.2d at 1128, and there were conflicting statements in the affidavits submitted by the parties regarding the purpose and nature of the payments made by Armstrong, there was a genuine issue of material fact. Although the intent of the donor controls whether or not there was a gift, the trier of fact may not have accepted Armstrong's version of events – Tammy's testimony regarding the nature of the payments could have been more credible. Moreover, if, as Tammy asserts, the final payment was a loan rather than a gift, donative intent would not control the character of the payment.

While the court was permitted to draw probable inferences from the *uncontradicted* evidence because it would serve as the trier of fact, it was not permitted to make conclusive findings with regard to issues upon which the parties submitted conflicting evidence. *See Williams v. Computer Res., Inc.*, 123 Idaho 671, 673, 851 P.2d 967, 969 (1993) (holding that the trial court was not permitted to draw inferences regarding the parties' intent when the parties submitted conflicting evidence on the issue); *Ashby v. Hubbard*, 100 Idaho 67, 70, 593 P.2d 402, 405 (1979) (holding that a question involving the "intention expressed by the acts and statements of the parties" was a factual question for the jury); *Argyle v. Slemaker*, 107 Idaho 668, 670-71,

---

[8] The trial court admitted as much during the hearing on summary judgment, during which it stated: "issues about loans versus gifts and if a gift, to whom, that that's – can be the stuff of nuances and that's laden with fact . . . And so I'm concerned about – that this may just be the stuff where a hearing or a trial . . . is appropriate."

691 P.2d 1283, 1285-86 (Ct. App. 1984) (holding that findings based on conflicting evidence may only be made on summary judgment when "the evidence is entirely confined to a written record, there is no additional, in-court testimony to be obtained, and the trial judge alone will be responsible for choosing the evidentiary facts he deems most probable"). Nor was the court permitted to judge the credibility of the affiants. *See Baxter*, 135 Idaho at 172, 16 P.3d at 269 ("[I]t is not proper for the trial judge to assess the credibility of an affiant at the summary judgment stage when credibility can be tested in court before the trier of fact."); *Argyle*, 107 Idaho at 670, 691 P.2d at 1285 (holding that even when the court will serve as trier of fact, credibility determinations "should not be made on summary judgment if credibility can be tested by testimony in court before the trier of fact"). Yet, in its decision the court clearly weighed the conflicting evidence and judged the affiants' credibility.

Only after finding Armstrong's version of events more credible did the court conclude that there was no genuine issue of material fact. The court rejected Tammy's understanding of the payment arrangement because her "only argument that such payment was a loan was that it was her 'understanding' that she would repay Mr. Armstrong." The court mischaracterized what Tammy stated in her affidavit. She stated that Armstrong offered to pay the premiums with "the" understanding that Tammy would repay him when she received the death benefit. A personal understanding of a party is different than an understanding or agreement between the parties. It would have been reasonable for the court to infer from Tammy's statement that Armstrong agreed to pay the premiums, knowing that this would preserve the policy for the benefit of the Dixsons and that, with Mark's death imminent, he would be repaid at a time in the relatively near future. It might be pointed out that neither the affidavit of Tammy nor that of Armstrong was ideal from the standpoint of specificity. Neither affiant specifically identified the time, location, or persons present, where any agreement or understanding was reached. For his part, Armstrong stated he was motivated to make a gift to Mark, based on his understandings that Tammy refused to pay the policy premiums, that Tammy was not visiting Mark or taking care of his expenses, and that Mark wanted the death benefit to be available for his children. Armstrong did not indicate the facts upon which he based these personal understandings that motivated him to make the alleged gift.

Rather than recognizing the conflicting contentions as to the basis upon which Armstrong made the premium payments, the court improperly chose to adopt Armstrong's version,

apparently deeming it to be more credible. Since it was not entitled to weigh the credibility of the affiants, the court erred in concluding that there was no genuine issue of material fact regarding the character of the policy proceeds. Because Tammy's affidavit was sufficient to create a genuine issue of material fact as to the nature of the premium payments, and hence the policy proceeds, the district court erred in granting the Trust's motion for summary judgment.

## C.

Tammy asserts that, notwithstanding the character of the premium payments, she is entitled to the entire policy proceeds. She states the April 27, 2006, beneficiary change was invalid because she did not give her written consent and because it was made in violation of the temporary restraining order. Further, she argues that, pursuant to Idaho Code section 41-1830, the policy proceeds were her separate property. The district court correctly ruled against Tammy on each of these three issues but erred with regard to a fourth issue – the effectiveness of the first beneficiary change form executed by Mark on January 31, 2005.

Tammy argues that the court's decision upholding the change in beneficiary, which was made without her consent, violated the terms of the policy and Idaho law. She contends that the change in beneficiary form, which "clearly" required spousal consent, was a part of the policy under Idaho law. By failing to obtain her consent before designating a new beneficiary, Tammy maintains that Mark did not comply with the policy's terms for making an effective beneficiary change. She argues that, in recognizing the change, the trial court rewrote the insurance contract and disregarded Idaho law.

The Trust contends that Tammy's consent was not required for Mark to effect a change of beneficiary. It points out that the policy itself does not require spousal consent unless required by state law. Because Idaho does not require spousal consent to name a new beneficiary, the Trust argues that any contrary indication on the beneficiary change form was a misstatement of Idaho law.

In Idaho, spouses have independent control over their own separate property. *See* I.C. § 32-904. Accordingly, if the policy was Mark's separate property, he could designate a new beneficiary without Tammy's consent and the Trust would be entitled to the policy proceeds. *See Anderson*, 77 Idaho at 380, 292 P.2d at 764.

If the policy belonged to the marital community the issue is not so clear cut. Generally, "[i]f an asset is community property it cannot be given away without the consent of both marital

partners." *Williams*, 126 Idaho at 440, 885 P.2d at 1156. A change in beneficiary of a community life insurance policy will be regarded as a gift of community property when the change is "purely a gratuity" and no consideration is paid. *Johnson*, 97 Idaho at 340, 544 P.2d at 298; *Anderson*, 77 Idaho at 378, 292 P.2d at 762. When one spouse attempts to unilaterally make a gift of a community insurance policy that is substantial in amount, the non-consenting spouse is entitled, during the life of the grantor, to void the gift in its entirety. *Johnson*, 97 Idaho at 340, 544 P.2d at 298. After the death of the grantor spouse, however, the non-consenting spouse may only void the gift as to his or her one-half interest. *Id*.; *Anderson*, 77 Idaho at 380, 292 P.2d at 764. The other half "that goes to the beneficiary is the interest of the decedent spouse." *Severson*, 143 Idaho at 632, 151 P.3d at 828.

Here, Tammy is challenging the gift of what she argues was a community life insurance policy after Mark's death. Even assuming the policy belonged to the marital community, Mark was entitled to gift his half of the asset by designating a beneficiary other than Tammy. His failure to obtain her consent would not void the entire gift, but would only permit Tammy to void the gift as to her one-half interest. Because it is unclear whether the policy was separate or community property, however, Tammy's interest will have to be determined on remand.[9]

Tammy argues, further, that the beneficiary change made on April 27, 2006, on Mark's behalf by one of his attorneys-in-fact, was violative of the temporary restraining order issued in the divorce action and, therefore, void. We need not address that issue, however, because the parties and the district court erroneously focused on the second beneficiary change, overlooking the beneficiary change form that Mark executed on January 31, 2005, prior to the initiation of the divorce action and entry of the temporary restraining order. The district court held that the first beneficiary change was not effective because it was not "received" by the insurance company, as required by the language of the policy. According to the district court, "[a]lthough the Trust argues that the change of beneficiary form is effective as of the mailing date under the 'Mailbox Rule,' the life insurance policy provides that such beneficiary change only takes effect after

---

[9] The terms of the policy do not alter this conclusion. The beneficiary change form simply stated that: "[t]he following states require a spousal signature AZ, CA, ID, LA, NV, NM, TX, WA, WI, and Puerto Rico." For the reasons discussed above, this is a misstatement of the law in Idaho. Moreover, as stated by the district court, nothing in the insurance policy itself "specifie[d] that a change of beneficiary form requires the spouse's signature." Nonetheless, Tammy argues that the beneficiary change form was part of the policy and, therefore, that the policy required Mark to obtain her consent. Even assuming the form was part of the policy, it did not impose a requirement that Mark receive Tammy's consent. Clearly, the form only required spousal signature when mandated by state law, which is not the case in Idaho. The policy did not impose its own independent spousal consent requirement.

14

written notice is received, rather than on the date notice was sent." The district court's ruling overlooks this Court's decision in *IDS Life Insurance Co. v. Estate of Groshong*, 112 Idaho 847, 736 P.2d 1301 (1987).

Timothy Groshong divorced his first wife in March of 1983 and shortly thereafter married his second wife. In June of 1983, Mr. Groshong executed two change of beneficiary forms for his retirement plan and trust agreement with his employer, IDS. He died two weeks later but the change of beneficiary forms were never received at the IDS home office. The retirement plan documents provided that no change of beneficiary would be effective until and unless the change of beneficiary forms were received by the company. *Id.* at 848, 736 P.2d at 1302. Faced with competing claims by the first and second wives, IDS brought an interpleader action. The trial court concluded that Mr. Groshong had substantially complied with the requirements to change the beneficiary of his retirement plans and this Court affirmed. The question on appeal was stated as "whether the trial court erred in ruling that the beneficiary was effectively changed by execution of the forms before witnesses, despite the fact the forms were not received by the head office of the insurance company, which receipt was required under the terms of the plan documents." *Id.* at 849, 736 P.2d at 1303.

The Court determined that substantial compliance was effective to accomplish a change of beneficiary, stating:

> The test to establish whether substantial compliance has been satisfied has two prongs: There must be evidence that (1) the insured had determined to change the beneficiary, and (2) that the insured had done everything to the best of his ability to effect the change.

*Id.* With regard to the first prong, we stated:

> Several factors have been viewed by the courts as providing sufficient foundation to conclude that the insured had determined to change the beneficiary. Among those factors is the completeness with which the insured filled out the forms. . . . Further, the courts have also given weight to the testimony of witnesses which establish that the insured intended to make a change of beneficiary.

*Id.* at 850, 736 P.2d at 1304. In this case, Mark signed a completed beneficiary change form making Jackie Young the primary beneficiary of the policy. The form was witnessed by Canyin Barnes, who stated in her affidavit that Mark wanted to appoint his mother as primary beneficiary in order to "be comforted in knowing that the funds would be used for his children's care and education" and that he was "very adamant that this Beneficiary Change Form be

15

completed." Barnes testified that Mark signed the form and that she witnessed his signature. This uncontroverted evidence supports the first prong of the test.

The second prong of the test is whether the insured had done everything to the best of his ability to effect the change. Here, Mark signed the form, the copy of the form which appears in the record is completed, and Barnes testified that she mailed the form to BLI on January 31, 2005. Although it appears that BLI may not have received the form, it is clear that Mark did everything within his control to effectuate the change. Thus, the second prong of the test is satisfied. Even though the first change of beneficiary may not have complied with the terms of the policy, it was effective to change the beneficiary of the policy under the authority of *Groshong*. The district court reached the right result – Jackie Young became the primary beneficiary of the policy but that occurred by virtue of the first beneficiary change rather than the second.

Tammy next argues that the policy proceeds were her separate property by virtue of the provisions of Idaho Code section 41-1830. She argues that under this section, "a life insurance policy insuring the life of a husband is the separate property of the wife." As Mark's wife at the time of his death, she maintains that the policy proceeds were her separate property and that any attempt to remove her as the beneficiary was "void and unenforceable." Accordingly, she argues that the district court's conclusion that she was not entitled to the policy proceeds under Idaho Code section 41-1830 was erroneous. Further, by not applying section 41-1830, she argues the district court "circumvent[ed] the legislature's intended financial protection for a spouse in order to reach a result not intended or provided for by Idaho law."

The Trust argues that the district court properly concluded that Idaho Code section 41-1830 does not control the character of the policy proceeds. It points out that the statute does not apply where the terms of the policy contradict the provisions of the statute. Because Mark's policy allowed him to change the beneficiary designation, its terms were contrary to the statute and, therefore, control. Moreover, it contends that the district court properly concluded that the statute, which is included in the chapter governing insurance contracts, was not intended to create an exception to Idaho community property law. Alternatively, the Trust argues that if the statute does apply, it violates the equal protection clause of the Fourteenth Amendment and, thus, is unconstitutional. It argues that the preferential treatment the statute gives to married women over married men does not advance a legitimate state objective.

16

Idaho Code section 41-1830 provides:

Every policy of life insurance heretofore or hereafter made payable to or for the benefit of a married woman, or after its issue heretofore or hereafter assigned, transferred or in any way made payable to a married woman, or to any person in trust for her or for her benefit, whether procured by herself, her husband or any other person, and whether the assignment or transfer is made by her husband, or by any other person, shall, unless contrary to the terms of the policy, inure to her separate use and benefit.

After considering Tammy's arguments, the district court concluded that it was unlikely that the legislature "intended to abrogate the structure of law in Idaho regarding community property governed by case precedent and statutory authority in Title 32." The court reasoned that, had the legislature intended to create an exception to Idaho community property law, it would have created such an exception in Title 32, which governs distribution of community property, rather than in the insurance code contained in Title 41. As a result, the court held that section 41-1830 did not grant Tammy a separate property interest in the policy proceeds. The Court did not address the Trust's constitutional argument, which we find to be dispositive.

In a celebrated Idaho case, the United States Supreme Court held a provision of Idaho's former probate code, giving preference to men over women when persons of the same entitlement class applied for appointment as administrator of a decedent's estate, to be violative of the Equal Protection Clause of the Fourteenth Amendment. *Reed v. Reed*, 404 U.S. 71 (1971). Although the probate provision in *Reed* differs in a number of respects from Idaho Code section 41-1830, the effect is similar. Section 41-1830 declares insurance policies made for the benefit of married women to be their separate property, while making no similar provision for married men. We find the section to be facially violative of the Fourteenth Amendment and hold it to be unconstitutional.

The Equal Protection Clause prohibits a state from "deny[ing] the equal protection of the laws to any person within its jurisdiction." *Reed*, 404 U.S. at 74. Laws that treat individuals differently solely on the basis of gender violate the Fourteenth Amendment unless they are able to withstand intermediate scrutiny. *Id.* at 75-76. In order to withstand intermediate scrutiny, gender classifications must serve "important governmental objectives" and the "discriminatory means employed [must be] substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (internal quotation marks omitted) (quoting

17

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). In other words, gender classifications "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Reed*, 404 U.S. at 76 (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Moreover, the government's objectives "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533. As the United States Supreme Court stated in *Orr v. Orr*, 440 U.S. 268 (1979):

> Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the "proper place" of women and their need for special protection. Thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where . . . the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex. And this is doubly so where the choice made by the State appears to redound-if only indirectly-to the benefit of those without need for special solicitude.

*Orr*, 440 U.S. at 283 (internal citations omitted).

It is apparent from the face of section 41-1830 that the statute violates the Fourteenth Amendment. The preference section 41-1830 gives to married women over married men is arbitrary and bears no substantial relationship to the purposes behind the laws governing community property distribution or the laws governing insurance contracts. *See Suter v. Suter*, 97 Idaho 461, 467, 546 P.2d 1169, 1175 (1976). The statute is merely another example of an outdated law attempting to "protect" women by providing them with economic independence while providing no similar protection for men. *See, e.g., Murphey v. Murphey*, 103 Idaho 720, 722, 653 P.2d 441, 443 (1982) (holding that former Idaho Code section 32-706, which only permitted courts to award alimony to wives, violated equal protection because "[t]he goals of the alimony statute would be fulfilled as much by a statute which extends benefits to both needy wives and needy husbands as by a statute which extends benefits to needy wives only"); *Suter*, 97 Idaho at 467, 546 P.2d at 1175 (holding that Idaho Code section 32-909, which granted a married woman a separate property interest in earnings accumulated while she was not living with her husband, was unconstitutional because the husband's similar earnings were treated as community property). There is no rational reason for guaranteeing married women a separate

property interest in life insurance policies made payable to their benefit and denying the same guarantee to married men. By limiting its protection to married women, section 41-1830 creates an unconstitutional distinction that not only reinforces stereotypes about women, but also deprives married men of equal protection of the laws and, therefore, the statute is unconstitutional. Thus, the provision did not vest Tammy with a separate property interest in the policy proceeds.

## D.

If the district court determines on remand that the policy was Mark's separate property, then Tammy is not entitled to any of the proceeds. *See* I.C. § 32-904 (granting spouses independent control over their own separate property); *see also Anderson*, 77 Idaho at 380, 292 P.2d at 764. If, on the other hand, the court determines that the policy was community property, then Tammy is entitled to one-half of the proceeds. *See Johnson*, 97 Idaho at 340, 544 P.2d at 298 (holding that, after the death of the grantor spouse, a non-consenting spouse may void a gift of community property as to his or her one-half interest). The remaining one-half, which constituted Mark's share of the community policy, would belong to the Trust as the assignee of the policy's named beneficiary. *See Severson*, 143 Idaho at 632, 151 P.3d at 828.

## E.

Tammy argues that the district court's award of attorney fees and costs should be reversed because it was not justified under Idaho law. The Trust argues that the trial court's award of fees and costs was appropriate.

Because we vacate the district court's order granting the Trust's motion for summary, the award of costs and fees is necessarily vacated. Therefore, we need not address Tammy's challenges to the fee award on appeal.

## F.

Tammy and the Trust both request an award of attorney fees and costs on appeal. Tammy bases her request on Idaho Appellate Rule 41, while the Trust relies on Idaho Code sections 12-120(3), 12-121, 15-8-208, Idaho Rule of Civil Procedure 54(e)(1), and Idaho Appellate Rules 40 and 41.

Tammy is not entitled to an award of fees on appeal because she failed to support her request with both argument and authority. *See Thompson v. Motel 6*, 135 Idaho 373, 378, 17 P.3d 874, 879 (2001). In her brief, Tammy simply stated that she is entitled to fees under Rule

19

41. However, we have previously held that Rule 41 does not serve as substantive authority for awarding fees; it only "specifies the procedure for requesting an award of attorney fees on appeal." *Athay v. Stacey*, 146 Idaho 407, 422, 196 P.3d 325, 340 (2008) (quoting *Gilman v. Davis*, 138 Idaho 599, 603, 67 P.3d 78, 82 (2003)). Accordingly, Tammy's request for fees is denied.

Nor is the Trust entitled to fees on appeal. An award of fees under both Idaho Code section 12-120(3) and section 12-121 may only be made to the prevailing party. I.C. §§ 12-120(3) & 12-121; Idaho R. Civ. P. 54(e)(1). Because we conclude that the district court erred in granting the Trust's motion for summary judgment, the Trust is not the prevailing party on appeal. Therefore, the Trust is not entitled to fees under sections 12-120 and 12-121. Next, we decline to award the Trust fees under section 15-8-208. That section allows courts to award fees in cases governed by the Trust and Estate Dispute Resolution Act when doing so would be equitable. In light of the fact that Tammy's appeal was successful, it would be inequitable to award the Trust fees under section 15-8-208. Finally, the Trust is not entitled to fees under Rules 40 and 41 since those rules do not provide a substantive basis for awarding fees. *See Athay*, 146 Idaho at 422, 196 P.3d at 340.

## III.

The district court's orders granting the Trust's motion for summary judgment and awarding the Trust fees and costs are vacated. The case is remanded for further proceedings to be conducted in accordance with this opinion. Neither party is entitled to fees on appeal.

Chief Justice EISMANN, and Justices BURDICK, W. JONES and HORTON CONCUR.