**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 38066**

| | | |
|---|---|---|
| JEBB HUSKINSON and BRANDIE HUSKINSON, a married couple, | ) ) ) | |
| Plaintiffs-Respondents, | ) ) | Boise, January 2012 Term |
| v. | ) ) ) | 2012 Opinion No. 38 |
| LYNN C. NELSON, JR., and JANA NELSON, a married couple, | ) ) ) | Filed: March 2, 2012 |
| Defendants-Appellants. | ) ) ) | Stephen W. Kenyon, Clerk |
| | ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Madison County. Hon. Gregory S. Anderson, District Judge.

The judgment of the district court is <u>vacated</u> and the case is <u>remanded</u>.

Hopkins Roden Crockett Hansen & Hoopes, PLLC, Idaho Falls, for appellants. C. Timothy Hopkins argued.

Rigby Andrus & Rigby, Chtd., Rexburg, for respondents. Hyrum Erickson argued.

———————————————

J. JONES, Justice.

This is a boundary dispute. Appellants Lynn and Jana Nelson argue that they own a strip of land even though the county records show respondents Jebb and Brandie Huskinson to be the owners of record. The Nelsons contend that the disputed land belongs to them because of a boundary by agreement. The district court granted summary judgment to the Huskinsons. We now vacate the district court's judgment and remand the case.

## I.
## BACKGROUND

The Nelsons and Huskinsons own adjacent parcels of real property in the SE1/4 of the SE1/4, Section 31, Township 5 North, Range 40 East, Madison County, Idaho. The east side of the Nelsons' parcel joins the west side of the Huskinsons' parcel. Before 1947, Orrin and Adaline

1

Jeppson owned that entire quarter-quarter section, so they owned both the Nelsons' and the Huskinsons' parcels. Since at least 1947, a north-south fence ("the fence") has divided what was the Jeppsons' property. The fence runs parallel to, and west of, the Lenroot Canal, which runs the length of the property. According to Norman Erickson, who was born in 1915 and has lived near the disputed property for much of his life, the Jeppsons farmed the land to the west of the canal and raised cattle on the land east of it. On June 19, 1947, Henry and DeVeda Erickson bought the Jeppsons' entire property. The Ericksons sold the "West 866 feet" of the property, the parcel the Nelsons now own, to George Nelson the following day, June 20, 1947. George Nelson sold the parcel to his son, Chester, in June 1952. Chester, in turn, sold it to appellant Lynn Nelson on November 10, 1988. The Nelsons have owned and farmed the parcel ever since. Like their predecessors in interest, the Nelsons farm up to the fence.

In February 2009, the Huskinsons bought a parcel that the Ericksons had retained from their original purchase from the Jeppsons. That is, the Huskinsons bought a parcel in the same quarter-quarter section as the Nelsons' parcel. The Huskinsons' property is immediately to the east of the Nelsons' parcel. The Huskinsons contend that the fence runs through their property, between 40 and 54 feet from the western boundary. The Huskinsons therefore brought this action in February 2010 to quiet title, for trespass, and for ejectment, arguing that since the Nelsons are farming up to the fence, they have been farming a portion of the Huskinsons' land.

The Nelsons filed a counterclaim, alleging they own the disputed strip of land under a theory of boundary by agreement. According to the Nelsons, the fence was intended to be a boundary between the parcels or has been recognized as a boundary since 1947. Both sides moved for summary judgment. The district court granted summary judgment to the Huskinsons, concluding that the fence was not intended to be a boundary when it was built. The court thus held that there was no boundary by agreement. The Nelsons timely appealed.

## II.
## ANALYSIS

### A.      Standard of Review.

This Court employs the same standard in reviewing an order for summary judgment as the district court used when it originally ruled on the motion. *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). When a matter would be tried to the district court, and not to a jury, the court, as trier of fact, "is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences." *P.O. Ventures, Inc. v. Loucks Family Irrevocable Trust*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007). So, although conflicting evidence must be viewed in a light favorable to the nonmoving party, conflicting inferences need not be. *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Trust*, 147 Idaho 117, 124, 206 P.3d 481, 488 (2009); *Cox v. Clanton*, 137 Idaho 492, 494, 50 P.3d 987, 989 (2002). This Court exercises free review over the record before it to determine whether the district court's inferences are supported, and to determine whether either side is entitled to judgment as a matter of law. *P.O. Ventures, Inc.*, 144 Idaho at 237, 159 P.3d at 874.

**B.    Summary Judgment Was Not Appropriate.**

In a case of this nature, where a party asserts ownership over a strip of land shown by property records to be titled to a neighbor, we start with the assumption that the property records are correct. A party with title to the disputed property is presumed to be the legal owner of the property. *Teton Peaks Inv. Co., LLC v. Ohme*, 146 Idaho 394, 397, 195 P.3d 1207, 1210 (2008). "Another person who claims ownership to that property must establish the claim by clear, satisfactory, and convincing evidence." *Id.* That may be done by producing such evidence, showing that the parties agreed to a boundary other than the one indicated by the property records.

A boundary by agreement requires two things: (1) an uncertain or disputed legal boundary and (2) an agreement between neighboring landowners as to what will be the boundary. *Flying Elk Inv., LLC v. Cornwall*, 149 Idaho 9, 13, 232 P.3d 330, 334 (2010). "Ignorance of the true boundary creates the uncertainty necessary to satisfy the first element." *Id.* If there is no express agreement, and if the doctrine is to apply, then the court must infer that there was an agreement between the parties based on their behavior. *Griffin v. Anderson*, 144 Idaho 376, 378, 162 P.3d 755, 757 (2007); *see also Teton Peaks*, 146 Idaho at 397, 195 P.3d at 1210 (stating that the agreement to make a boundary may be either express or implied). A fence between neighboring properties can imply an agreement. *Griffin*, 144 Idaho at 378, 162 P.3d at

3

757.

Evidence of a long-established fence creates two presumptions. *Luce v. Marble*, 142 Idaho 264, 271−72, 127 P.3d 167, 174−75 (2005). First, the law presumes an agreement fixing the fence line as the boundary when coterminous landowners have treated the fence as the property line for so long "that neither ought to be allowed to deny the correctness of its location." *Id.* at 271, 127 P.3d at 174. (internal quotation marks omitted). Second, the law presumes the fence was originally located as the boundary by agreement where there is a "want of any evidence as to the manner or circumstances of its original location." *Id.* at 272, 127 P.3d at 175. Accordingly, "the long existence and recognition of a fence as a boundary, in the absence of any evidence as to the manner or circumstances of its original location, strongly suggests that the fence was located as a boundary by agreement." *Cameron v. Neal*, 130 Idaho 898, 901, 950 P.2d 1237, 1240 (1997).

A boundary by agreement is also sometimes called a boundary by acquiescence. *Griffel v. Reynolds*, 136 Idaho 397, 400, 34 P.3d 1080, 1083 (2001). But an agreement, either express or implied, "is essential to a claim of boundary by acquiescence." *Id.* at 401, 34 P.3d at 1084. *See also Cox*, 137 Idaho at 495, 50 P.3d at 990 (holding that there was no boundary by acquiescence because the evidence failed to show an agreement to treat a fence as a boundary). "Since there must be an agreement, acquiescence 'is merely regarded as competent evidence of the agreement,' and alone is not enough to establish a boundary by agreement." *Flying Elk*, 149 Idaho at 13, 232 P.3d at 334 (quoting *Griffel*, 136 Idaho at 400, 34 P.3d at 1083). Nonetheless, "[a] long period of acquiescence . . . provides a factual basis from which an agreement can be inferred." *Griffel*, 136 Idaho at 400, 34 P.3d at 1083. Moreover, "[a]llowing an adjoining landowner to improve the disputed land is [also] evidence of an agreement." *Flying Elk*, 149 Idaho at 13, 232 P.3d at 334.

In this case, the district court held that there was no agreement at the time the fence was erected to establish it as a boundary line. First, the court opined that "[i]f the fence was erected on or before June 19, 1947, it would not have been erected between coterminous landowners and the presumptions would not apply." This is because prior to June 19, 1947, the Nelsons' parcel and the Huskinsons' parcel were united under the common ownership of the Jeppsons. In an affidavit, Norman Erickson stated that when he was young the Jeppsons' land west of the canal

4

was farmed, while the land on the east side had cattle on it. Based on that affidavit, the court inferred that the Jeppsons probably built the fence to keep cattle confined to one side of their land.[1] The court also noted that the Nelsons admitted in their answer and counterclaim that the fence had existed since their predecessors in interest acquired the property in 1947. So, the court concluded the evidence implied that the fence was built while the property was in common ownership and not for the purpose of creating a boundary. The court therefore held that the fence did not constitute a boundary by agreement.

The Nelsons argue that the district court erred because the evidence does "not give any indication as to when the fence line was built, who built it, or why it was built." The Nelsons contend that a number of affiants established that the fence has existed for as long as anyone could remember and that successive landowners on both sides of the fence had treated it as a boundary. They also assert that the district court erred by inferring the Jeppsons built the fence to confine their cattle. They therefore argue that the length of time the fence has existed, coupled with a lack of evidence as to its purpose, establishes a presumption of a boundary by agreement on the fence line. The Nelsons further argue that even if the fence was built while the Jeppsons owned the property, the fence has nevertheless been treated as a boundary subsequently and, therefore, is a boundary by agreement.

The Huskinsons respond that the Nelsons have not put forth "any evidence or argument regarding when the alleged agreement was made. Rather, [they have] relied solely on the 'unknown fence' presumption as the evidence of the agreement." This, according to the Huskinsons, is insufficient for the Nelsons to maintain their action because there is evidence in the record suggesting that the fence has been in place since the Jeppsons owned the entire quarter-quarter section. Therefore, the Huskinsons assert that regardless of the conduct of subsequent owners, the Nelsons are not entitled to a presumption that the fence is a boundary and the Nelsons have failed to show any other agreement.

The district court did not err in drawing the inference that the fence was not originally built as a boundary. The real property claims here are equitable and therefore would be tried to the court without a jury. *See Loomis v. Union Pac. R. Co.*, 97 Idaho 341, 346, 544 P.2d 299, 304

---

[1] Erickson made no mention of the fence in his affidavit and did not state how close the farming activity on the west side came to the canal.

(1975) ("In suits to quiet title to real property, no right to trial by jury exists."). The district judge was therefore free to draw probable inferences from the unconflicting evidence because he would sit as factfinder. While there was no direct evidence indicating when the fence was built, the court inferred that it existed in 1947, when the Nelsons' and Huskinsons' parcels were united in common ownership because of the Nelsons' admission that the fence had existed since their predecessors in interest first acquired the property—when it was divided in 1947. The court's inference is probable, even if one could draw other inferences from the record. The Nelsons have not pointed to any evidence that contradicts the inference. They just disagree with the district court. The Huskinsons have thus rebutted a presumption that the fence was built to establish a boundary, and the Nelsons failed to point to anything in the record that suggests the fence was built as a boundary. We therefore accept the district court's conclusion that the fence did not constitute a boundary by agreement when it was built.

However, the district court erred in basing its decision solely upon the finding that the fence was not initially built as a boundary fence. The court apparently assumed that nothing which occurred during the subsequent sixty years could have resulted in an agreement to fix the boundary along the fence line and therefore did not consider the conduct of the parties after 1947. However, that is not necessarily the end of the story. In *Griffel*, we stated:

> Where no express agreement is shown, the agreed upon boundary "must therefore be determined from the conduct of the parties, viewed in the light of the surrounding circumstances." . . . A long period of acquiescence by one party to another party's use of the disputed property provides a factual basis from which an agreement can be inferred.

136 Idaho at 400, 34 P.3d at 1083. The district court should have analyzed the evidence in the record to see whether it supported the establishment of a boundary by agreement subsequent to 1947.

There was evidence in the record that would support the conclusion that the Nelsons and the predecessors in interest of both parties agreed to the fence line as a boundary based upon their long-standing acquiescence and conduct. The Nelsons put forth evidence that a number of residents in the area near the disputed property considered the fence to be the boundary.[2] The

---

[2] One affiant, Stanley Sutton, stated that from September of 1977 to January of 1996, he owned a piece of property immediately north of the Huskinsons' property and immediately east of the Nelsons' property. He stated that he

6

Nelsons assert that they had always considered the fence to be the eastern boundary of their property and were thus ignorant of the actual boundary. This is supported by Lynn Nelson's affidavit, which stated that he has "always believed and understood that the property line dividing my property from the Huskinsons' property was the fence line that is located there today." An affidavit of Jebb Huskinson attempts to call this into question. Mr. Huskinson's affidavit included, as an exhibit, a "Record of Survey for Lynn Nelson," which was recorded in Madison County in December 1988. That survey showed a discrepancy between the property description in the Nelsons' recorded deed and the property the Nelsons claimed to own. The survey noted that the parcel described in the Nelsons' deed is 866 feet wide, but indicated that the distance to a fence that roughly parallels the parcel's eastern boundary is more than 866 feet. In other words, the survey showed that a fence on the eastern boundary—presumably the fence central to this action—was outside the Nelsons' deeded parcel. Thus, one might infer that the Nelsons were not ignorant of the legal boundary of their property and, in fact, knew since 1988 that the fence was not the actual boundary. However, one could also infer that, regardless of the survey, the Nelsons still understood the fence to be the boundary because their predecessors had been using the property all of the way to the fence for about 40 years before that survey.

The Huskinsons' predecessors also appear to have acquiesced in the fence as the property boundary and treated it as such. There is no evidence in the record that any predecessor in interest of the Huskinsons made complaint regarding the Nelsons' use of the property from 1947 until after the Huskinsons acquired their parcel in 2009. During that 60-year period of time, the Nelsons and their predecessors had undisputed use and control of the property on the west side of the fence and it appears that the Huskinsons' predecessors confined their use of the property to that on the east side of the fence. Photographs of the fence line, which the Nelsons' counsel referred to and used in his oral argument in the district court, show a row of mature trees between the canal and the fence. The Nelsons' counsel referred to these trees as a windbreak. Based on an aerial photo of the disputed boundary, it is reasonable to infer that the trees were, in fact, planted as a windbreak. And because landowners might typically plant a windbreak at, or very near their property line, the

always regarded the fence as the property boundary. Attorney Blair Grover stated in his affidavit that his parents acquired property immediately east of the Nelsons' property in the late 1950s or early 1960s and still own the same. The Grover property is apparently located south of the Huskinsons' property, although it is not clear from Grover's affidavit. He stated that he always believed the fence line was the property boundary.

location of the trees here also implies that the Huskinsons' predecessors treated the fence as the boundary. So, while the Huskinsons' predecessors did not farm up to the fence line, they treated their property on the east side of the fence like one would treat a boundary.

Furthermore, it is unlikely that the Huskinsons' predecessors knew of the actual boundary but nonetheless orally agreed to make the fence the boundary or that they gave the Nelsons and their predecessors permission to use and control the property up to the fence. It is likely that, had the Huskinsons' predecessors known that the Nelsons and their predecessors were using land that actually belonged to them, they would have taken action to assert their ownership rights, unless there was an agreement that allowed the Nelsons to do so. The most reasonable inference to draw from the evidence in the record is the owners of neither parcel were aware of the true property boundary until the controversy arose between these parties.

The foregoing discussion regarding the conduct of the parties after 1947 is not to suggest that the district court should have found in favor of the Nelsons. Acquiescence in the location of a fence line, even for a long period of time, does not necessarily tip the scales in favor of the encroaching party. The problem here is that the district court did not analyze the post-1947 evidence to see whether it suggested a subsequent agreement regarding the boundary line.

Of perhaps more importance is the district court's failure to consider the significance of uncontested evidence presented by the Nelsons that they and their immediate predecessor in interest had farmed up to the fence line for almost sixty years. Glenna McCullough testified in her affidavit that her brother, Chester Nelson, owned the Nelsons' parcel between 1952 and 1988, when he sold it to the Nelsons. She stated that, "[p]rior to selling the property to [the Nelsons], Chester Nelson continuously farmed his property on the west side of the fence line which divided his property from that property currently owned by [the Huskinsons]." In his affidavit, Lynn Nelson stated, "[s]ince we purchased the property in November of 1988, we have farmed all of the property up to this fence." Even if the fence line had not existed for this period of nearly 60 years, the fact of farming up to the line where the fence was located certainly supports an inference that the farming was done by agreement. This Court has previously held that farming lines, standing alone, can provide the evidence necessary to support a boundary by agreement.

In *Griffel*, this Court considered a boundary by agreement premised on farming lines. 136 Idaho 397, 34 P.3d 1080. There, a man named Stegelmeier bought a parcel in 1976 and began

farming it the next year. *Id.* at 398, 34 P.3d at 1081. Adjacent land to the north and to the west of Stegelmeier's parcel had been farmed for some years before Stegelmeier began farming—since at least 1943 on the parcel to the west. *Id.* at 399, 34 P.3d at 1082. Stegelmeier farmed his land until 1991 and sold it in 1995. *Id.* at 398–99, 34 P.3d at 1081–82. Stegelmeier's successors in interest, the Reynolds, had the land surveyed. *Id.* The Reynolds discovered that the legal description of their property extended beyond the farming lines to the west and north—*i.e.*, both the neighbors to the west and to the north were farming strips of land that the property records indicated to be owned by the Reynolds. *See id.* When the Reynolds attempted to build a fence along the deeded property lines, the neighbors sued, claiming that the farming lines constituted the actual property line on a theory of boundary by agreement. *Id.* at 399, 34 P.3d at 1082. Both neighbors testified that they had farmed up to a fence line, dividing their property from the property acquired by the Reynolds, but neither neighbor offered "evidence as to when the fences were erected, by whom, [or] for what purpose." *Id.* at 400, 34 P.3d at 1083. This Court noted, "because the fences were no longer in existence when Stegelmeier purchased his land, the [neighbors] cannot rely on the old fence lines to prove an agreement but must meet their burden of proof with other evidence." *Id.*

The *Griffel* Court affirmed the district court's decision that the farming lines did, in fact, constitute a boundary by agreement. *Id.* at 401, 34 P.3d at 1084. "The record disclose[d] that Stegelmeier never confronted [his neighbors] with objections as to the location of their farming lines." *Id.* at 400, 34 P.3d at 1083. Rather, "the farming lines had remained substantially unchanged since 1978." *Id.* That finding was based in part on expert testimony that the actual farming lines had been the same over the entire period. *Id.* at 401, 34 P.3d at 1084. The Court was "satisfied" that Stegelmeier and his neighbors "tacitly accepted the farming lines as visible evidence of their dividing lines for a long period of time." *Id.* The Court affirmed the district court's finding that this acquiescence—"the mutual recognition of the farming lines and the occupation and cultivation by each party up to the lines"—implied an agreement between Stegelmeier and his neighbors that those lines would constitute their property boundaries. *Id.*

This case is substantially similar to *Griffel*, except that the parties here, or their predecessors, have recognized the farming lines up to the fence as the property boundary for three times as long as the neighbors in *Griffel*. In that case, expert testimony established that the farming lines remained unchanged. Here, it is uncontroverted that the Nelsons and their immediate

9

predecessor farmed up to the fence continuously since 1952. Furthermore, the Huskinsons' predecessors' conduct as to the fence—allowing the Nelsons to farm on one side while maintaining a windbreak on the other—implies an agreement. Thus, there is clear and convincing evidence from which the district court could have found that the Nelsons, and their predecessor, and the Huskinsons' predecessors impliedly agreed to the farming line and fence as the boundary between their parcels, and they did so for long enough that nobody should now be heard to complain. The district court limited its analysis to conduct at the time the fence was built. But the conduct of the subsequent landowners as to the farming lines and fence over the last 60 years is also relevant. The district court erred in failing to consider whether a boundary by agreement may have arisen during that time. Therefore, we vacate the judgment and remand for further proceedings.

C.      **Neither the Nelsons nor the Huskinsons are entitled to fees on appeal.**

The Huskinsons request attorney fees on appeal. The Nelsons also sought fees when they filed this appeal but abandoned their request at oral argument. The Huskinsons have not prevailed and therefore are not entitled to fees.

### III.
### CONCLUSION

We vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion. We award costs to the Nelsons, but no attorney fees.


Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.