44 P.3d 1149

**Virginia KOHRING, Plaintiff–Appellant– Cross Respondent,**

v.

**Eugene Frank ROBERTSON and Susan Gail Robertson, husband and wife, Kent G. Kohring, and Tri–Vial, Inc., Defendants–Respondents–Cross Appellants.**

**Eugene Frank Robertson and Susan Gail Robertson, husband and wife, Counterclaimants,**

v.

**Kent G. Kohring and Virginia Kohring, husband and wife, Counterdefendants.**

No. 26327.

Supreme Court of Idaho, Boise, January 2002 Term.

March 22, 2002.

Jim Jones & Associates, Boise, for plaintiff-appellant-cross respondent. Jim Jones argued.

Hamilton, Michaelson & Hilty, Nampa, for defendants-respondents-cross appellants Robertson. Terry M. Michaelson argued.

Kent Kohring, Bruneau, pro se.

KIDWELL, Justice.

Virginia Kohring filed a complaint as an individual and as a shareholder in Tri–Vial, Inc., against Kent Kohring, Eugene and Susan Robertson, and Tri–Vial, Inc., requesting the return of certain real and personal property to Tri–Vial, Inc. Virginia appeals the district court's decisions not to convey certain real property to her and not to enforce the parties' settlement agreement. On cross appeal, the Robertsons appeal the district court's decision that Eugene Robertson breached the fiduciary duty he owed to Virginia as well as the award of attorney fees to Virginia.

## I.

### FACTS AND PROCEDURAL BACKGROUND

This case stems from a dispute between the Kohrings and the Robertsons, shareholders in Tri–Vial, Inc. (Tri–Vial), a closely-held family corporation. Kent Kohring (Kent) and Virginia Kohring (Virginia) are husband and wife; Eugene Robertson (Gene) and Susan Robertson (Susan) are husband and wife. Kent and Susan are brother and sister.

There are three parcels of land at issue in this case, as well as farm equipment and miscellaneous personal property. Parcel 1 (Joint 320) consists of 320 acres described as the W½NW¼, SE¼NW¼, NE¼ SW¼, N½SE¼ and S½NE¼, Section 25, Township 6 South, Range 4 East, Boise Meridian, Owyhee County, Idaho. Parcel 2 (Kohring 320) consists of 320 acres described as the N½NE¼, NE¼NW¼, Section 25; the SE¼SE¼, Section 24; the E½NW¼ and Government Lots 1 and 2, Section 30; and a portion of Section 36, Township 6 South, Range 4 East, Boise Meridian, Owyhee County, Idaho. Parcel 3 (Well Site) consists of three acres described

as a portion of the SW¼, SW¼, Section 36, Township 6 South, Range 4 East, Boise Meridian, Owyhee County, Idaho. Parcels 1 and 2 are contiguous. Parcel 3 contains two wells that supply irrigation water to Parcels 1 and 2.

The Joint 320 and Well Site were originally owned and farmed by Kent and Susan's parents. The parents' home on the Joint 320 is now the Kohrings' residence. Some time in the early 1970's, the parents accepted a $25,000 loan from the Robertsons, promising them a one-fourth interest in the Joint 320. However, the parents sold the Joint 320 and the Well Site to the Kohrings. In 1974, the Kohrings acquired the Kohring 320 through a desert entry grant. On February 14, 1977, the Kohrings sold an undivided one-half interest in the Joint 320 and the Well Site to the Robertsons. The sale specifically excluded from the Joint 320 the two and one-half acres upon which the Kohring home is located.

Kent and his father farmed the Joint 320 together from 1956 to 1974, and both the Joint 320 and the Kohring 320 from 1974 to 1977. The Kohrings and the Robertsons farmed the land in partnership from 1977 to 1980. From 1980 to 1983, the parties leased the land to Kent and Virginia's sons, Gary and Dan. Beginning in 1983, the land was leased to and farmed by Gary. The Joint 320 and the Kohring 320 were farmed as a single unit, using the Well Site to irrigate both parcels of land. In the 1980's, more farms were developed in the area, causing the water table to rise. This caused an increase in alkali salt deposits, and the productivity and value of the land decreased.

Kent borrowed $28,000 from the Farmers Home Administration (FmHA) in the early 1980's, which was used to finance a new drainage system used by both parcels of land in an effort to minimize the salt deposits. To receive the loan, both 320's, the Well Site, and the Kohring home became encumbered. The new drainage system worked for a short time, but eventually failed. Kent began researching a FmHA buyout program in an attempt to reduce the debt owed to the FmHA. He retained Galen Guthrie (Guthrie), an experienced realtor, to assist in the process.

Guthrie explained that the FmHA had a program that allowed for the forgiveness of farm debt. To take advantage of this buyout program, Guthrie told the parties they would need to form a corporation that would buy all of the encumbered property at fair market value. The corporation would then enter into a buyout agreement with the FmHA. The buyout would result in the forgiveness of the amount of the deficiency between the FmHA loan and the selling price to the corporation. However, for this to work, it was necessary for all the parties to be involved, and all of the encumbered property had to be put into the corporation. Guthrie testified that he advised the Robertsons that it would be in their best interest to convey the Kohring 320 and the Kohring home back to the Kohrings about one year after the buyout. Then, the corporation would consist of the jointly owned property, and the Robertsons and the Kohrings would be equal shareholders. The one-year delay was needed so as not to raise any red flags with the IRS or the FmHA. The parties had meetings with Guthrie to facilitate the establishment of the corporation and the FmHA buyout.

Tri–Vial was incorporated on October 24, 1992. Each of the parties received a one-fourth interest in the corporation. The district court found that each party was a shareholder and director of Tri–Vial. Corporate officers were elected—Susan as president, Kent as vice-president, and Gene as secretary-treasurer. Gene was authorized to sign checks drawn against the corporate account. Guthrie was authorized to negotiate the buyout with the FmHA on behalf of Tri–Vial.

The FmHA rejected Tri–Vial's offers, but made a counteroffer that was accepted by the parties at a shareholders/directors' meeting held on March 12, 1994. A special meeting of the shareholders was held on June 14, 1994, to select a person to execute the documents required by the FmHA. The Joint 320, the Kohring 320, the Kohring home, and the Well Site were deeded to Tri–Vial on June 17, 1994. Immediately following the buyout, Kent requested that the Kohring home be deeded back to the Kohrings. He was ad-

vised by Guthrie to wait one year. Another shareholders/directors' meeting was held on August 2, 1994. The buyout was discussed, as were the equipment and buildings on the farm. Kent and Guthrie testified that there was an agreement that the Kohring 320 and home would be conveyed back to the Kohrings within a year of the buyout. Kent testified that preliminary plans for returning the property to the Kohrings were discussed at the August 2, 1994, meeting.

Kent asked Gene in the spring of 1995 to convey the Kohring home to the Kohrings. Gene and Kent conducted a survey of the home and surrounding acreage. On behalf of Tri–Vial, Gene conveyed the home to the Kohrings on June 15, 1995. One major factual dispute centered on whether a shareholders/directors' meeting, at which the distribution of Tri–Vial's property and dissolution of the corporation was discussed, was held on June 1, 1995. Virginia testified there was no meeting, but that a discussion between Gene and Kent occurred. Kent testified that no meeting occurred. The Robertsons testified there was a meeting, although Gene later testified that it may not have occurred on June 1, 1995. There was undisputed testimony that Virginia was not present at any meeting or discussion on June 1, 1995. Gene testified that he agreed to the conveyance of the Kohring home, but felt that if the Kohring 320 was conveyed to the Kohrings, then all of the property should be conveyed out of the corporation. This reflected his belief that for the corporation to be viable, the parcels had to be farmed as a single unit.

Kent testified that he asked Gene in August of 1995 about the Kohring 320 and that Gene seemed reluctant to convey the property. Gene and Kent met with Guthrie and Terry Dodds (Dodds), a CPA, regarding the distribution of Tri–Vial's property. A shareholders' meeting was called on September 5, 1995, to elect officers. Virginia did not attend because of a conflict. Gene gave Kent a proposed plan of property distribution—the timing of this act was disputed by the two men. Gene and Kent met with Dodds on November 16, 1995, to discuss the distribu-

tion of Tri–Vial's funds. On November 17, 1995, the property was conveyed. The Kohring 320 was returned to the Kohrings, and the Joint 320 and Well Site were divided and conveyed to the parties.

Virginia did not find out about the conveyances until January of 1996. Upon realizing how the Joint 320 and Well Site had been divided between the Kohrings and the Robertsons, Virginia demanded that the property be returned to Tri–Vial to be redistributed in a more equitable manner. Her attorney sent three letters stating Virginia's requests to the Robertsons, but received no response.

On June 5, 1997, Virginia filed a complaint against the Robertsons, Kent, and Tri–Vial, alleging the ultra vires transfers of the corporation's real and personal property. She claimed that the defendants' approval of a plan of dissolution violated I.C. § 30–1–84. Virginia argued that as a shareholder, she was entitled to notice and an opportunity to vote on the planned dissolution. She also contended that Gene, as secretary-treasurer, did not have the authority to transfer the corporation's property. Virginia brought the action as a derivative suit and in her individual capacity as a shareholder. The Robertsons counterclaimed, seeking a judicial dissolution of Tri–Vial pursuant to I.C. § 30–1–1430 because the shareholders were deadlocked. They also asserted six affirmative defenses to Virginia's complaint.

On February 10, 1998, the Robertsons filed a motion for summary judgment on their counterclaim. The district court denied the motion after hearing arguments on March 31, 1998. That same day, Virginia filed an amended complaint.

On April 23, 1998, at the time originally set for trial, the parties orally stipulated to a Settlement Agreement (Settlement Agreement), on the record before the district court. Of great importance was the discussion of how the property would be irrigated. Virginia's attorney placed the parties' stipulations on the record, and the Robertsons' attorney clarified the issue of water usage. Of particular importance was the following exchange between the parties' attorneys:

Mr. Jones: There will be a joint water agreement that will affect the entire 640

acres. The agreement which Counsel will work out and submit to the parties will provide for the watering of the property as it has been handled in the past with water spreading to allow the use of the water to all parts of the 640, again, as it has been done in the past. With regard to maintenance where there are major repairs or replacement items that need to be done, the parties will equally share in doing that work on the main line and pumps and other facilities that they jointly use in the irrigation of their respective properties.

. . . .

Ms. Wildwood: [I] did have a clarification with regard to the water agreement, Jim, and that is that so long as there is no impairment of the water rights are pertinent [sic] to Robertsons 160. In other words, there would not be a dissolution of the water attributable to that 160 wherever Kent wants to use the 160. The water attributable to his 160 would be his business, but there would not be a dissolution to the water rights to the Robertsons 160. Mr. Jones: Right. I think I understand what you mean.

The district court applauded the parties' efforts in reaching the Settlement Agreement. The court ordered the parties to put the Settlement Agreement in writing, but disputes arose between the parties regarding several of the stipulations.

On May 28, 1998, Virginia filed a motion to enforce and clarify settlement agreement. She argued that the Robertsons were not adhering to the stipulation that the land would be irrigated as it had been in the past—through water spreading. She alleged that the Robertsons had proposed a ten-day water rotation schedule, which was something the parties had never done in the past. She also listed multiple other disputes regarding the Settlement Agreement. On July 14, 1998, the court heard oral arguments on the motion, and denied it in an order dated September 30, 1998. The district court held that the stipulation regarding the water use on the land was merely an "agreement to agree," because the intent of the parties was to enter into a subsequent agreement. The court found that although the attorneys discussed working out the water agreement, they did not agree to or define all of the pertinent terms involved. Because the parties indicated during the hearing on the motion that the water agreement was the major contention between them, the court held that "the unenforceability of the water agreement is dispositive of the enforceability as to the remainder of the stipulation." Having decided the motion on that issue, Virginia's other claims were not addressed by the district court.

On October 14, 1998, Virginia filed a motion for reconsideration or in the alternative, certification under Rule 54(b). On November 13, 1998, the district court heard oral arguments on the motion, and denied it in an order dated November 23, 1998.

Because the parties were unable to reach an agreement, a trial was held on February 1 and 2, 1999. The district court issued its *memorandum decision and order on June 3*, 1999, followed by a judgment entered on July 12, 1999.

Virginia and Kent filed motions to reconsider, arguing among other things that the Kohring home should not be returned to Tri Vial. Virginia also filed a memorandum of costs and supporting affidavit, requesting attorney fees. On November 12, 1999, the court heard oral arguments on the post-trial *motions, and issued its decision on January 2*, 2000. The district court found that its holding regarding the Kohring home and surrounding acreage was not supported by the record, and amended its judgment to reflect that the Kohrings were not required to convey their home back to Tri–Vial. The court stated that Virginia was the prevailing party and awarded her fees under I.C. § 30–1–746, finding that the return of property to Tri–Vial resulted in a substantial benefit to the corporation.

On March 9, 2000, Virginia filed her timely notice of appeal. On March 27, 2000, the Robertsons filed their timely notice of cross appeal.

## II.

### STANDARD OF REVIEW

In *Beard v. George*, 135 Idaho 685, 687, 23 P.3d 147, 149 (2001), this Court set forth the following standard of review:

"Findings of fact cannot be set aside on appeal unless they are clearly erroneous, i.e. not supported by substantial, competent evidence." *Savage Lateral Ditch Water Users Ass'n v. Pulley,* 125 Idaho 237, 241–42, 869 P.2d 554, 558–59 (1993). Likewise, the "[t]rial court's findings and conclusions which are based on substantial although conflicting evidence will not be disturbed on appeal." *Sun Valley Shamrock Resources, Inc. v. Travelers Leasing Corp.,* 118 Idaho 116, 118, 794 P.2d 1389, 1391 (1990). Since it is the province of the trial court to weigh conflicting evidence and testimony and to judge the credibility of the witnesses, "the trial court's findings of fact will be liberally construed in favor of the judgment entered." *Id.*

When questions of law are presented, this Court exercises free review and is not bound by findings of the district court but is free to draw its own conclusions from the evidence presented. *See Regjovich v. First Western Investments, Inc.,* 134 Idaho 154, 997 P.2d 615 (2000) (citing *Mutual of Enumclaw v. Box,* 127 Idaho 851, 852, 908 P.2d 153, 154 (1995)).

*Beard,* 135 Idaho at 687, 23 P.3d at 149.

### III.

### ANALYSIS

**A. The District Court Erred In Finding That The Settlement Agreement Was Unenforceable.**

▮ Virginia suggests that the district court should have enforced the Settlement Agreement, which the parties orally stipulated to on the record before the district court. We agree.

▮ "Oral stipulations of the parties in the presence of the court are generally held to be binding, especially when acted upon or entered on the court records...." *Conley v. Whittlesey,* 126 Idaho 630, 633, 888 P.2d 804, 807 (Ct.App.1995) (citation omitted). "Stipulations for the settlement of litigation are regarded with favor by the courts and will be enforced unless good cause to the contrary is shown." *Id.* at 634, 888 P.2d at 808 (citations omitted). "An attempted stipulation is ineffective when it is clear from the record that the parties never assented to it." *First Sec. Bank v. Neibaur,* 98 Idaho 598, 605, 570 P.2d 276, 283 (1977) (citations omitted). "A stipulation is a contract. The enforceability of an oral stipulation is determined by contract principles." *Olson v. Idaho Dept. of Water Resources,* 105 Idaho 98, 100, 666 P.2d 188, 190 (1983) (citation omitted). "Whether the parties to an oral agreement or stipulation become bound prior to the drafting and execution of a contemplated formal writing is largely a question of intent." *Conley,* 126 Idaho at 634, 888 P.2d at 808. "[A] contract must be complete, definite and certain in all its material terms, or *contain provisions which are capable in themselves of being reduced to certainty.*" *Giacobbi Square v. PEK Corp.,* 105 Idaho 346, 348, 670 P.2d 51, 53 (1983) (citations omitted) (emphasis in original).

After a lengthy legal battle did not resolve the parties' disputes, they were prepared to go to trial. On April 23, 1998, the time set for trial, the parties began settlement negotiations that were ultimately successful. The parties were able to resolve not only the issues in the litigation, but other contentions between the parties. Specifically, the Settlement Agreement resolved the following issues:

1. Re-division of the Joint 320 between the Kohrings and the Robertsons so that each family received 160 acres and the Robertsons received the land referred to as the Well Site;

2. The Kohrings were given a first right of refusal on the Robertson 160—the Kohrings would have 30 days to purchase the land on the same terms and conditions of a third party offer. If the sale was not consummated, the first right of refusal would continue for any subsequent sale;

3. Division of personal property—the irrigation lines were to be divided with three-quarters going to the Kohrings and one-quarter going to the Robertsons; the farm equipment would continue to be jointly owned by the parties;

4. Water agreement—watering of the property would be done as it had been in the past, through water spreading. The parties would share any expenses for major repairs or replacement of items on the main lines, pumps, and other facilities used jointly to irrigate their properties equally. Counsel for the Robertsons' clarified that there was not to be any dissolution of the water right attributable to the Robertsons' 160;

5. BLM roadway—the Robertsons agreed to drop their objection to the placement of a roadway along their property. The Kohrings agreed to gravel the road and take reasonable steps to control dust near the Robertson home, regardless of whether the private parties or the county is given ultimate responsibility for the road;

6. Tri–Vial would be dissolved as soon as the winding up of the corporation was completed. Each party agreed to pay its own attorney fees and costs, and to dismiss this action with prejudice; and

7. The parties agreed that the Robertson 160 would be leased to Gary Kohring for ten years, with a five-year renewal option. The terms and conditions of the previous lease between the Robertsons and Gary would be in effect for this lease, with modifications to the water rights paragraph that would reflect the resolution reached in the Settlement Agreement. The parties could not reach an agreement on one of the subparagraphs in the lease, but agreed that it would be resolved between the Robertsons and Gary. If a resolution was not reached, they would request the court facilitate resolution by arbitration.

The record reflects that after Virginia's attorney placed the stipulations on the record, the district judge asked each attorney and each of the parties if they understood the Settlement Agreement, if they agreed with the recited settlement, and if it resolved all the issues. Every person responded in the affirmative. Other than the clarification regarding the use of water on the land, neither counsel for the Robertsons, nor the Robertsons themselves made any corrections to the stipulations placed on the record by Virginia's counsel. The record demonstrates that the Settlement Agreement merely needed to be memorialized in writing.

However, the parties were unable to reduce the stipulations to writing. The correspondence between the parties' counsel tracks the unraveling of the Settlement Agreement that began with the Robertsons' declaration that they would not agree to water spreading and then requested that watering of the land be done on a ten-day rotation schedule. The parties had agreed on the record to use water spreading to irrigate the land; the parties had never utilized a ten-day rotation schedule in their twenty years of joint farming. The rotation schedule did not satisfy the parties' stipulation to water the land as they had done in the past. The disagreement about the watering of the properties led to the undoing of some of the other agreed-upon stipulations. Some of the alterations made by the Robertsons included changing the Kohrings' first right of refusal from thirty days to only five days, disputing the joint ownership of the irrigation pumps and electrical equipment for the two wells involved, and modifying the stipulated lease agreement with Gary.

The disputes over the Settlement Agreement led Virginia to file a motion to enforce and clarify settlement agreement. The district court found that the parties had agreed to agree about the water right issue. The court held that the essential terms necessary to the water agreement were uncertain in the Settlement Agreement placed on the record by counsel. The court also found that the parties intended the future writing as the final agreement. It found that because the water dispute was the main contention between the parties, the entire Settlement Agreement was not enforceable.

The district court, in determining that the parties had agreed to agree, focused on the future-tense language used by the attorneys when they were discussing putting the watering agreement in writing. Yet, it would be expected that the attorneys would discuss a document to be written in the future in the

future tense, regardless of whether the document was intended to be a ministerial act or a future negotiation.

The record does not support the district court's holding that certain essential terms were not defined. All parties agreed, before the court, that the watering was to be done as it had been done in the past—through water spreading. Since the parties had jointly farmed the land for twenty years and agreed to water spreading on the record, the court's finding that the watering standard was unclear is difficult to reach. Counsel for the Robertsons did clarify that the Robertsons' water right was not to be diminished in any way, but there is no evidence that water spreading would have resulted in a diminished water right.

The evidence supports the finding that the parties intended the Settlement Agreement to be final. The parties and their attorneys agreed in court that the Settlement Agreement was intended to settle all of the disputes between the Kohrings and the Robertsons. The Robertsons and their attorney agreed to each stipulation, only clarifying that their water right was not to be diminished. Idaho case law does not support the Robertsons' attempt to question or alter numerous stipulations contained in the Settlement Agreement after agreeing to each one on the record. We find the Settlement Agreement is enforceable against the parties.

### B. The District Court's Award Of Attorney Fees to Virginia Is Vacated.

The district court found that Virginia was the prevailing party and awarded her attorney fees at the conclusion of the trial under I.C. § 30–1–746, finding that the return of real and personal property to Tri–Vial resulted in a substantial benefit to the corporation. Because we vacated the district court's findings by determining that the Settlement Agreement is enforceable, the award of attorney fees to Virginia below is vacated.

### C. The Remaining Issues On Appeal And Cross Appeal Are Moot.

The parties had raised additional issues on appeal and cross appeal. Because of this Court's finding that the Settlement Agreement is enforceable, the issues as to whether there was an agreement between the parties to convey the Kohring 320 back to the Kohrings after the FmHA buyout, whether Tri–Vial held the Kohring 320 in trust for the Kohrings, and whether Gene breached his fiduciary duty to Virginia do not need to be addressed.

### D. Neither Virginia Kohring Nor The Robertsons Are Entitled To Attorney Fees On Appeal.

Virginia and the Robertsons requested attorney fees on appeal pursuant to I.C. § 30–1–746. However, neither Virginia nor the Robertsons met the requirements set forth in I.A.R. 41(a), 35(a)(5), and 35(b)(5), which is necessary when asking this Court to award attorney fees. *See Bingham v. Montane Res. Assocs.*, 133 Idaho 420, 427, 987 P.2d 1035, 1042 (1999) (declining to award attorney fees on appeal because the party made the request in its reply brief, not the first appellate brief submitted); *Sheridan v. Jambura*, 135 Idaho 787, 792, 25 P.3d 100, 105 (2001) (declining to award attorney fees on appeal because the party's request consisted of two conclusory sentences and was not supported by any statutes, law, authority, or argument). This Court declines to award attorney fees on appeal, rendering an analysis of whether I.C. § 30–1–746 applies to attorney fees on appeal unnecessary.

### IV.

### CONCLUSION

This Court finds that the Settlement Agreement is enforceable against the Kohrings and the Robertsons. In finding so, the district court's award of attorney fees to Virginia is vacated. The remaining issues on appeal are rendered moot by this Court's holding. No attorney fees on appeal are awarded. This matter is remanded to the district court for further proceedings consistent with this opinion. Costs to appellant.

Justices SCHROEDER, WALTERS, EISMANN and Justice Pro Tem McKEE concur.