# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 39224

| | |
|---|---|
| AMY S. BARUCH, | ) |
| | ) Boise, April 2013 Term |
| Plaintiff-Respondent, | ) |
| | ) 2013 Opinion No. 66 |
| v. | ) |
| | ) Filed: May 31, 2013 |
| WILLIAM P. CLARK, | ) |
| | ) Stephen W. Kenyon, Clerk |
| Defendant-Appellant. | ) |

Appeal from the district court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Kathryn Sticklen, District Judge.

The judgment of the district court is <u>affirmed</u>.

Cosho Humphrey, LLP, Boise, attorneys for Appellant.

Bevis, Thiry & Schindele, PA, Boise, attorneys for Respondent.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

This is an appeal from a judgment of the magistrate court concerning the division of certain property pursuant to the divorce between Appellant, Bill Clark ("Bill"), and Amy Baruch ("Amy"). Bill appealed the magistrate court's decision to the district court, which affirmed the magistrate's decision. Bill appeals to this Court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Bill Clark and Amy Baruch were married on December 1, 2000. Amy filed for divorce on January 28, 2009. Prior to entering the marriage, Bill and Amy had significant personal and real property. Amy separately owned a home in Boise, which sold just prior to her marriage to Bill. Amy received $108,047 from the sale of her separate home. Meanwhile, Bill owned a home in Boise as his separate property. That home was ultimately conveyed to the community when it

1

was refinanced in 2001 and 2002. The $108,047 proceeds from the sale of Amy's separate home were used to purchase a community vacation home in McCall ("McCall cabin").[1]

Before and during the marriage, Bill was self-employed in the real estate development business. His primary income was from his company, Clark Development, LLC. In addition to Clark Development, Bill developed property through various other business entities. These entities included Veltex Building, LLC[2], which was formed to acquire the site on which BED Investments, LLC,[3] would build and develop a residential and office condominium complex ("Veltex building"). Though Bill acquired an interest in these entities before the marriage, it is unclear when precisely he acquired his interests.[4] Bill maintains that the planning for the Veltex building was completed before his marriage to Amy in 2000. At the time of marriage, Bill owned neither the site on which the Veltex building was built nor the building itself; rather, he owned an interest in the various entities that owned the property. Ground was broken for the Veltex building sometime after September 2002, and the Veltex building was completed in 2004.

Bill only received two distributions related to the Veltex building, and both distributions were received during the marriage. In October 2005, BED Investments received $260,800 from the sale of units in the Veltex building. Bill had an IRA before entering the marriage ("Schwab 3714"). Both separate and community funds were deposited into Schwab 3714. The magistrate court found Schwab 3714 to be "Bill's Working Account."[5] The distributions from the Veltex building were deposited into the Schwab 3714 account. In February 2007, Veltex deposited another $342,149 into the Schwab 3714 account on Bill's behalf.

On March 28, 2007, Bill and Amy purchased a condominium in Ketchum, Idaho ("Ketchum condominium"). The condominium was purchased for $975,000. During closing, the parties submitted checks in the amount of $30,000 and $175,539 as a down payment. Bill claims that the down payment on the condominium was paid using his separate funds that were

---

[1] The magistrate court found the McCall cabin to be a community asset. That finding is not challenged on appeal.

[2] The magistrate found Veltex Building, LLC to be separate property with a value of $1,464.

[3] In April of 2008, BED Investments was dissolved.

[4] The magistrate court noted that at trial Bill testified that BED Investments was a partner in Veltex at the time Veltex was established, and that he acquired an interest in BED Investments at the same time it acquired an interest. Bill testified that these events occurred in 1997. However, Veltex was not established until October 29, 1998, and BED Investments was not formed until January 22, 1999.

[5] We note that an IRA recognized as a qualified account under the Internal Revenue Code has various restrictions on their usage. *See* 2012 I.R.S. Publication 590. Whether Bill's multiple IRAs in this case were qualified accounts under the Internal Revenue Code and whether Bill's use of his various accounts was appropriate is not the subject of this opinion. We express no opinion on the propriety of Bill's IRA accounts. In this opinion, we are simply concerned with division of the assets in the marital estate under the community property laws of Idaho.

proceeds from the February 7, 2007, Veltex distribution in the amount of $342,149 ("Veltex distribution"). Amy claims that she and Bill anticipated using the proceeds from the sale of the McCall cabin to pay down the loan on the Ketchum condominium. In September 2007, the McCall cabin was sold and the proceeds of $231,682 from the sale were deposited into Schwab 3714. Amy was unable to adequately trace the proceeds of her separate Boise home, which was used to purchase the McCall cabin; therefore, the proceeds from her home were treated as community property.

At the time of the marriage, Bill owned an IRA through Charles Schwab, account number ending in 3713 ("Schwab 3713"). At the time of marriage, the account was valued at $386,636. At the time of trial, the account was valued at $354,350. During the marriage, the community made contributions to Schwab 3713 totaling $207,313. In 2005, Bill effected a transfer from Schwab 3713 in the amount of $100,000. This money was transferred to Pensco Trust[6], which invested money into Pearson Partners[7], an entity in which Bill was a partner, for purposes of building a subdivision in McCall. In 2007, Bill received a distribution from Schwab 3713 in the amount of $1,495. In 2008, Bill effected another transfer from Schwab 3713 in the amount of $150,000. This money was transferred to Pensco Trust, which invested in Meyer Clark, LLC[8], which loaned money to Crescent Rim, LLC. This money appears to have been used for additional collateral on a project with which Bill was involved. Amy did not agree to advancing funds to the Crescent Rim project. In 2009 after the divorce began, Bill took a distribution of

---

[6] It appears from the record that the transfer to Pensco Trust was to a self-directed IRA.

[7] The magistrate court described Pearson Partners as follows:

> On August 4th, 2005, Bill registered Pearson Partners LLC with the Idaho Secretary of State, and on the same day, entered into an operating agreement as the LLC's managing partner . . . Bill took an interest in the LLC through two separate entities; Clark Development LLC, which was given credit for $100,000 contribution (characterized at the time as "sweat equity"), and Pensco Trust, William Clark IRA, which actually contributed $100,000. Through each entity he acquired a 10% interest in the LLC, which was later increased to 12% for each by way of the amended operating agreement entered into on December 23rd, 2008.
>
> The source of the funds used to invest on behalf of Pensco was, as discussed elsewhere herein, the Schwab 3713 account.

[8] Meyer Clark, LLC was a partnership with Steve Meyer for the purpose of investing in the Crescent Rim project. The only asset is a loan from Meyer Clark, LLC to Crescent Rim, LLC for $150,000. The funding for this loan originated from Schwab 3713. It appears that $150,000 from Schwab 3713 was transferred to Meyers Clark through Pensco Trust in 2008. This note was found worthless. The magistrate court found that the post-TRO attempted transfer to Crescent Rim from Schwab 3713 was ultimately not effective and the $150,000 that Bill attempted to pass through Sterling Trust was ultimately returned to Schwab 3713. The magistrate court found that Meyers Clark was Bill's separate property and had no value. This decision is not appealed.

$34,611 from Schwab 3713, of which $28,000 was invested in Pearson Partners to pay down a loan. In addition to the self-directed IRA at Pensco Trust, Bill also had a self-directed IRA with Sterling Trust, which he also used as a conduit to pass money from the Schwab 3713 account into his various projects. At the time of marriage, Amy had a 401(k) with a balance of $74,776. At the time of divorce, through community contributions, the value of the 401(k) increased to $479,274.

On January 28, 2009, Amy filed for divorce. The trial in this matter took place on March 31, 2010; April 1, 2010; and April 2, 2010. On July 26, 2010, the magistrate court issued its Findings of Fact and Conclusions of Law. The Decree of Divorce was entered on August 10, 2010. The magistrate court concluded that the Schwab 3713 and Schwab 3714 accounts were community property because the complex series of withdrawals in and out of these accounts, combined with community contributions, made it unable to track whether the transfers or the market affected the value of the accounts. The magistrate court also rejected Bill's claim for reimbursement of funds drawn from Schwab 3714 to make the down payment on the Ketchum condominium. The magistrate court found that the money from Schwab 3714 originated from the Veltex building, which the magistrate court found to be community income. Thus, it found the funds drawn from Schwab 3714 to pay the down payment on the Ketchum condominium were community funds and that Bill was not entitled to reimbursement. But assuming the funds were actually separate, the magistrate court found that Bill failed to adequately trace the separate property.

On August 16, 2010, Bill filed a Motion to Alter or Amend Findings of Fact and Conclusions of Law. After a hearing held on September 13, 2010, the magistrate court issued the Judgment and Order Re: Motion to Alter or Amend Findings of Fact and Conclusions of Law and Judgment on September 21, 2010. That judgment denied Bill's motion to alter or amend the judgment beyond making slight clerical corrections. On September 24, 2010, the magistrate court reissued the same order merely correcting the title.

On November 4, 2010, Bill filed a Notice of Appeal. On August 25, 2011, the district court entered a Memorandum Decision and Order affirming the magistrate court. On September 28, 2011, Bill filed a Notice of Appeal to this Court.

### III. ISSUES ON APPEAL

4

1. Whether the district court erred in affirming the different methods of valuation the magistrate court used in valuing and distributing Amy's 401(k) and the Schwab 3713 account.

2. Whether the court properly characterized the Veltex distribution as income presumptively belonging to the community.

3. Whether Amy is entitled to attorney fees on appeal.

## IV. STANDARD OF REVIEW

When this Court reviews a decision rendered by a district court acting in its appellate capacity, it considers the decision of the district court. *Dunagan v. Dunagan*, 147 Idaho 599, 601, 213 P.3d 384, 386 (2009); *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008). This Court exercises free review of the legal issues analyzed by the district court acting in its appellate capacity. *Carter v. Zollinger*, 146 Idaho 842, 844, 203 P.3d 1241, 1243 (2009).

> Division of community property in a divorce action is squarely within the discretion of the trial court. Review of a lower court's exercise of discretion is conducted under a three-tiered inquiry: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason.

*Dunagan*, 147 Idaho at 601, 213 P.3d at 386 (internal citations omitted).

## V. ANALYSIS

### A. The district court did not err in affirming the different methods the magistrate court used to value and divide Amy's 401(k) and the Schwab 3713 account.

Bill argues that the district court erred in affirming the magistrate court's characterization of Schwab 3713 as community property. Bill maintains that the district court should have awarded Bill and Amy each the value of their respective retirement accounts as of the date of marriage as their separate property. Since the value of Schwab 3713 at the time of divorce was less than it was at the time of marriage, Bill claims he should have been awarded the entire value of the account as his separate property. Bill further challenged the conclusions of both the district and magistrate courts that he consented to the treatment of Amy's 401(k) as her separate property. Ultimately, Bill asserts that Schwab 3713 should have been classified as his separate property because the magistrate court classified the value of Amy's 401(k) at the time of marriage as separate property; thus, it should have done so here.

5

Amy argues that Bill's contentions that he is entitled to the value of Schwab 3713 as of the date of marriage as separate property ignores the market fluctuations of the value of the account and the extensive assets that were transferred from Schwab 3713 into other investments. Amy maintains that Bill did in fact consent to the treatment of her 401(k) as separate property as a matter of tactics. Finally, Amy maintains that because of the complex series of transactions in and out of Schwab 3713, it was not possible for Bill to trace his separate property and the changes of value of Schwab 3713 with any degree of certainty.

The district court affirmed the magistrate court's classification of the entirety of Schwab 3713 as community property. The district court held that the magistrate court did not improperly apply the cases of *Maslen v. Maslen*, 121 Idaho 85, 822 P.2d 982 (1991) and *McCoy v. McCoy*, 125 Idaho 199, 868 P.2d 527 (Ct. App. 1994). The district court noted that those cases stand for the proposition that no strict, inflexible rule governs the treatment of retirement accounts, and the district court noted that the facts of those cases were different from the current matter where extensive transfers occurred. Because of the complexity of Bill's transactions with Schwab 3713, the district court found that it was not able to trace the funds of Schwab 3713 and that Bill was adequately compensated for his pre-marriage interest in the account through his investments.

Idaho Code § 32-903 provides that all property owned by a spouse before marriage and property acquired after marriage with the proceeds of separate property remain that spouse's separate property. However, all other property acquired after marriage—including income on separate property—is community property. I.C. § 32-906. In Idaho, "income derived during a period of marriage from the efforts, labor and industry of the parties constitute community assets." *Hiatt v. Hiatt*, 94 Idaho 367, 368, 487 P.2d 1121, 1122 (1971). Because all property acquired during marriage is presumed to be community property, a party wishing to show that assets acquired during marriage are separate property bears the burden of proving with reasonable certainty and particularity that the property is separate. *Barton v. Barton*, 132 Idaho 394, 396, 973 P.2d 746, 748 (1991). "Commingling of separate and community property does not convert the separate property to community property where the separate property can be identified through either direct tracing or accounting." *Id.* (citing *Houska v. Houska*, 95 Idaho 568, 570, 512 P.2d 1317, 1319 (1973); *Stahl v. Stahl*, 91 Idaho 794, 430 P.2d 685 (1967); *Evans v. Evans*, 92 Idaho 911, 453 P.2d 560 (1969)).

6

1.       *Amy's separate property interest in her 401(k) was not erroneously valued under Maslen.*

Both the district court and the magistrate court concluded that Bill stipulated that he was not claiming an interest in Amy's retirement account because he told the court he was not claiming such an interest. Oral stipulations of the parties in the presence of the court are generally held to be binding, especially when acted on or entered in the court records. *Kohringer v. Robertson*, 137 Idaho 94, 99, 44 P.3d 1149, 1154 (2002).

The district court relied upon an interaction between Bill and the magistrate in which the magistrate asked Bill whether he was claiming "any interest in that IRA," to which Bill responded "No, I don't claim any interest in it."[9] Bill argues that the magistrate misunderstood which IRA Bill was referencing, and Bill claims he was not actually referring to Amy's 401(k). However, in Bill's post-trial brief, in his discussion of Amy's 401(k), he states "[t]here was no dispute that [Amy's] 401(k) had a balance of $74,776 at the date of marriage . . . this balance would also be allocated to [Amy] as her separate property . . . ." Bill's rationale for arriving at this conclusion was his analysis of *Maslen* and *McCoy*, which he maintains provides that the difference between the account balances on the date of marriage and at the date of divorce determines how much of the account is community property. Neither the district nor the magistrate courts adopted this approach with regards to Schwab 3713, but used this approach with respect to Amy's 401(k).

In *Maslen*, the husband asserted that the magistrate improperly distributed his retirement account because the magistrate did not apply the time rule.[10] Instead the magistrate froze the account balance at the time of marriage and then subtracted that amount from the account balance at the time of divorce. 121 Idaho at 89–90, 822 P.2d at 986–87. This Court found that

---

[9] It appears from the record before this Court on appeal that the issue was whether Bill claimed an interest in the separate property of Amy's 401(k) as determined by the application of the *Maslen* approach. Neither the magistrate nor district court interpreted this statement of Bill's as a waiver of *all* of Bill's interest in Amy's 401(k). Indeed, on the Court's Property and Debt Schedule, the magistrate court, which relied on this representation of Bill's, applied the *Maslen* approach and found the entire 401(k) to be community property but for $74,776. Thus, the context of the record indicates that this statement was used by the magistrate court in determining that Bill claimed no interest in Amy's separate property interest in the account as determined by *Maslen*, and not that Bill claimed no interest in the account whatsoever.

[10] "The time rule determines community interest in a retirement fund by computing the ratio of the time of marriage . . . during which pension benefits were earned, to the total years of service during which the pension was earned. This percentage is then applied against the amount of retirement income to be received . . . one half of this amount [is the non-employee spouse's] half of the community asset." *Maslen*, 121 Idaho at 90 n.4, 822 P.2d at 987 n.4.

there is no one acceptable method of valuing community assets in retirement plans[11]; rather, trial courts are given broad discretion. *Id.* Particularly, this Court noted that there was no contention that the change in value of the retirement account during the marriage was separate property. *Id.* As such, the magistrate did not abuse his discretion in how he valued husband's separate property. *Id.*

In *McCoy* the same valuation process described in *Maslen* was employed to value two of wife's retirement accounts. 125 Idaho at 205, 868 P.2d at 533. Wife's interest in both of the retirement accounts was acquired before her marriage. *Id.* The value of the retirement accounts increased during the marriage. *Id.* The magistrate found the increase to be community property. *Id.* The Court of Appeals upheld the application of the *Maslen* method because there was no evidence of funds withdrawn from the accounts or contributions made during the marriage. *Id.* Therefore, it was held that this approach traced the parties' separate property in the accounts. *Id.*

Here, the district court properly affirmed the magistrate court's use of the *Maslen* approach in its valuation of Amy's 401(k). Like *Maslen* and *McCoy*, Amy's interest in her 401(k) was obtained prior to her marriage. Likewise, her 401(k) increased in value during the marriage as a result of community contributions. Amy's 401(k) was also like the retirement account in *McCoy* because there is no indication that any of the funds were transferred from the account. Also, Amy did not claim the increase in the value of her 401(k) as separate property. Additionally, Bill encouraged the use of the *Maslen* approach to distribute Amy's 401(k), and there is no indication that Amy objected to the use of this approach. Therefore, the magistrate court did not abuse its discretion when it valued Amy's 401(k) pursuant to *Maslen*.

>    *2.     Schwab 3713 was properly characterized as community property.*

Bill next contends that because Amy's retirement account was distributed pursuant to *Maslen*, so too should his account. The *Maslen* approach would have the effect of granting the

---

[11] In *Maslen*, this Court rejected a one-size-fits-all rule for dealing with the distribution of retirement accounts:

> Because the provisions of retirement plans vary so greatly from plan to plan, both in the manner of funding and also in the administration of the plans, and because the circumstances in each case are so varied, we decline to state a single inflexible rule for calculating the community interest or value of retirement plans . . . 'it appears to us to be impractical—if not impossible—to formulate a categorical rule about the appropriate treatment of retirement accounts in dissolution of marriage cases. We conclude that it is a better policy to allow the trial court sufficient discretion to consider the circumstances in each case to determine the most equitable manner for determining and dividing the marital portion of pension benefits.

*Maslen*, 121 Idaho at 91, 822 P.2d at 988.

entire value of Schwab 3713 to Bill as separate property because the account was valued at less than its value at the time of marriage.

In Idaho, the characterization of property as community or separate depends on the date and source of the property's acquisition. *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Trust*, 147 Idaho 117, 124, 206 P.3d 481, 488 (2009). "Commingling of separate and community property does not convert the separate property to community property where the separate property can be identified through either direct tracing or accounting." *Barton v. Barton*, 132 Idaho 394, 396, 973 P.2d 746, 748 (1991).

The source of the funds in Schwab 3713 and Amy's 401(k) are different and were treated differently during marriage—what applies to Amy's 401(k) does not necessarily govern the Schwab 3713 account. The district court did not err when it affirmed the magistrate court's classification of Schwab 3713 as community property. Bill had a separate property interest in Schwab 3713 because he obtained his interest in the retirement account before marriage. At the time of marriage, the separate property was valued at $354,350. Bill relied on *Maslen* and *McCoy* for the proposition that because he entered the marriage with this separate property, he should leave the marriage with this separate property. In both of those cases, the separate retirement account, which received contributions from the community, increased in value and funds were not transferred from that account. Here, however, the Schwab 3713 account did not increase in value during the marriage. If the *Maslen* approach would have been used to value the Schwab 3713 account—as urged by Bill—then the community would bear the *entire* risk of investment: If the account increased in value, Bill would receive the initial value of the account as separate property and share the increased value of the account with the community. If the account decreased in value—as it did—then Bill can claim the whole amount of the account while the community loses all of its contribution and thus bears the entire risk of investment.

We hold that the magistrate properly distinguished Schwab 3713 from the retirement accounts in *Maslen* and *McCoy* based on the complex series of transfers in and out of Schwab 3713. In both *Maslen* and *McCoy*, there were no transfers or withdrawals from the retirement account—only contributions. Here, however, Bill used Schwab 3713 in union with his Pensco Trust IRA and his Sterling Trust IRA to funnel money in and out of the Schwab 3713 account to his development projects. Bill maintains that this Court should view these three accounts as one single IRA. Consequently, Bill urges that this case would then be similar to *Maslen* and *McCoy*

9

because then no transfers were made from his account. This approach, however, overlooks the reality that Bill managed three IRAs at separate entities. The mere fact that Bill was able to avoid a tax consequence because he transferred money from Schwab 3713 into another IRA does not render all three accounts as separate entities one account.

Assuming, however, that these three accounts constituted effectively one IRA, were the magistrate court to apply the *Maslen* approach, it would result in a windfall to Bill with him being awarded $534,160 as his separate property. First, the magistrate court noted that the Pensco Trust IRA was comprised of investments in Meyer Clark and Pearson Partners. These investments were valued at $150,000. The only liquidity in the Pensco IRA was $1,619 in cash. The magistrate court awarded the $150,000 investments to Bill and the $1,619 in cash to Amy. Second, the Sterling Trust IRA was found to have a value of $29,810. It appeared to the magistrate court that the value constituted an investment in an organization named Alpha Lending, LLC. Again, $29,810 was awarded to Bill as his separate property. Third, Bill maintains that he should receive the full $354,350 value of Schwab 3713 as his separate property because Schwab 3713 is valued at less than it was before the marriage. This would result in a separate property award of $534,160 to Bill. Applying the approach, as urged by Bill, would result in a particularly egregious result given the community contribution of $207,313 into Schwab 3713, which was used to fund Bill's other IRAs.

Finally, Schwab 3713 was commingled with both separate and community funds. These funds were transferred in and out of this account to various projects on which Bill was working. Bill failed to adequately trace the assets of Schwab 3713 to demonstrate which profits and losses to the Schwab 3713 account belong to him as his separate property.

We conclude that the district court properly affirmed the magistrate court's valuation of community property in Schwab 3713. Schwab 3713 was highly commingled with separate and community property; was used to fund various other IRAs; and appears to have decreased in value largely because of transfers into other IRAs awarded to Bill as his separate property. Furthermore, as the district court noted, "Bill likely received what would have been separately due [to] him from [Schwab 3713], by using the proceeds from it to finance his business ventures. In other words, he had already received his separate benefit from [Schwab 3713], in the use of these community funds for his separate business purposes . . . ." The district court is therefore affirmed in its valuation of both Amy's 401(k) and the Schwab 3713 account.

10

**B.      The Veltex distribution was properly classified as income and therefore community property.**

Bill argues that the magistrate court improperly characterized the distributions related to the Veltex building as community property. Bill maintains that the distributions related to Veltex building were capital gains and not income. Bill challenges the magistrate court's conclusion that the gains were the result of the labor of the community because the community was compensated for the labor Bill expended when developing the Veltex building through a contract that Veltex, LLC had with Clark Development, LLC.

Amy argues that the magistrate court properly characterized the Veltex distributions as community property because significant community effort was expended on the project during the marriage. Amy contends the magistrate court properly characterized the distributions as community because the presumption is that funds earned during marriage are community funds, and Bill failed to overcome this presumption.

The district court affirmed the magistrate court's characterization of the Veltex distributions as community property. The district court noted that even though Bill created the plan for the development of the Veltex building before his marriage, he actually implemented the plan during the marriage. The district court also noted that the distributions that ultimately resulted from the Veltex building were not the result of the natural enhancement of the property, but the gain in value was the result of the effort expended during the marriage.

Idaho Code § 32-906(1) creates a presumption that all income earned from separate property acquired during marriage is community property unless expressly provided otherwise. The party challenging the classification of property acquired during marriage as community property has the burden of overcoming that presumption. *Mark Wallace Dixson Irrevocable Trust*, 147 Idaho at 124, 206 P.3d at 488; *see also Weilmunster v. Weilmunster*, 124 Idaho 227, 234, 858 P.2d 766, 773 (Ct. App. 1993). However, "as a general rule, though not absolute, a so-called profit or gain from the sale of separate property occasioned by the natural enhancement in the value of such property constitutes part of the separate estate." *Speer v. Quinlan*, 96 Idaho 119, 127, 525 P.2d 314, 322 (1974). When it comes to valuing the enhancement of separate property, this Court has held that "[a]s a general rule, the natural enhancement of value of separate property during coverture does not constitute community property; however, to the extent an enhancement in value is due to the community efforts, labor, industry or funds, it falls into the community." *Id.* "[I]f community efforts and ability have been expended in the conduct

11

of a separate property business, a proper inquiry . . . is whether the community has received fair and adequate compensation for its labor." *Id.* at 128, 525 P.2d at 323.

The district court properly affirmed the magistrate court's characterization of the Veltex distribution as income that belongs to the community.[12] Despite Bill's assertion to the contrary, the Veltex distribution was not a capital gain. A capital gain is "[t]he profit realized when a capital asset is sold or exchanged." Black's Law Dictionary, at 237 (9th ed. 2009). Income is "[t]he money or other form of payment that one receives . . . from employment, business investments, royalties, gifts, and the like." Black's Law Dictionary, at 831 (9th ed. 2009). Here, the magistrate court found it clear that Bill did not own either the Veltex building or the property on which it sat. Rather, the Veltex distribution came from Bill's interest in entities that themselves owned the Veltex building. The distribution, therefore, cannot be a capital gain because the profit was realized from the operations of the business entities that owned the Veltex building. Bill did not realize this distribution by selling the building because he did not own it, nor did he realize this distribution by selling his interest in the entities that owned the Veltex building because he still holds an interest in those entities. Furthermore, the distribution from the Veltex building was income because it was money that Bill realized from his business investments in said entities. Income from separate property, received during marriage, is community property. I.C. § 32-906.

---

[12] Bill argues that this it is improper to characterize the Veltex distribution as community property because it is necessary for a party seeking the reimbursement of a community contribution to separate property to prove that the community expenditures enhanced the value of the property. Bill relies largely on *Bliss v. Bliss*, 127 Idaho 170, 173, 898 P.2d 1081, 1084 (1995), for his proposition that the community must demonstrate how the value of the property was enhanced.

Bill's reliance on *Bliss* and its progeny is misplaced. That case deals with a situation where the community expends capital—not labor—or retained earnings, *see Swope v. Swope*, 122 Idaho 296, 302, 834 P.2d 298, 304 (1992), to improve separate property. That capital contribution, which is quantifiable, then enhances the separate estate. In such a situation, this Court has held that "[t]he measure of reimbursement for community *expenditures* on separate property is the increase in value of the property attributable thereto, not the *amount of value* of the community contribution." *Bliss*, 127 Idaho at 173, 898 P.2d at 1084 (emphasis added). Furthermore, the party claiming reimbursement has the burden of proving the value of the enhancement. *Id.*

The dispute in the current matter does not seek reimbursement for the value added to separate property from community contributions; it is an issue of whether the income earned from separate property during the marriage, while community labor was expended on the separate venture, is community. In such a situation where the contribution is labor and not capital, this Court has made clear that the inquiry is into whether the community was adequately compensated for the labor of a party. If not, it falls into the community. *See Speer*, 96 Idaho at 127, 525 P.2d at 322. When the community claims income and not reimbursement, Idaho statute presumes that income earned during marriage is community property. In the present matter, the Veltex distribution was not retained earnings, nor was the Veltex distribution a contribution from the community. Rather, it was income that was derived during the marriage from the development of the Veltex building, which involved the labor of the community.

12

The Veltex distribution did not result from the natural enhancement of Bill's separate property. First, Bill contends that all of the planning for the Veltex building was done prior to his marriage. However, the magistrate court questioned Bill's credibility because he struggled with understanding his financial transactions and construction on the Veltex building did not commence until well into the marriage. Second, Bill presented no evidence that his involvement in the development of property ceased when the plan was complete. There was no evidence demonstrating that Bill did not follow through with his developments while they were actually being developed. Thus, the magistrate's conclusion that the Veltex distribution was not the result of a natural enhancement of value is supported by substantial and competent evidence. Bill did not meet his burden of demonstrating that the Veltex distribution was separate property.

The final question is whether the community was adequately compensated for the labor of the community. Bill contends that he was compensated $8,500 per month from Clark Developments, LLC, for his labor, including his labor on the Veltex building. The magistrate court properly concluded that the community was not adequately compensated. There is no indication that Bill's payment from Clark Developments, LLC, was only for his work on the Veltex building and not for his other projects. Additionally, Bill used community assets in the Schwab 3713 account to invest in his development projects. Therefore, the magistrate court could conclude that the community was not adequately compensated for his labor.

Thus, the district court's characterization of the Veltex distribution as community property is affirmed. Because we hold that the district court's characterization of the Veltex distribution was not erroneous, we will not address Bill's argument that he is entitled to reimbursement of the down payment on the Ketchum condominium.

## C.     Attorney fees on appeal.

Bill did not request attorney fees on appeal. Amy requests attorney fees on appeal pursuant to I.C. § 12-121, and I.A.R. 41. The Court will award fees to a prevailing party in certain limited circumstances as authorized by I.C. § 12-121. *Owner-Operator Indep. Drivers Ass'n v. Idaho Pub. Utils. Comm'n*, 125 Idaho 401, 408, 871 P.2d 818, 825 (1994). But attorney fees are not awardable as a matter of right. *Id.* They should only be awarded when the court believes "that the action was pursued, defended, or brought frivolously, unreasonably, or without foundation." *Id.* Attorney fees will not be awarded for arguments that are based on a good faith legal argument. *E.g.*, *Backman v. Lawrence*, 147 Idaho 390, 401, 210 P.3d 75, 86 (2009). Amy is

13

not entitled to attorney fees because this appeal was not brought or pursued frivolously, unreasonably, or without foundation.

## VI. CONCLUSION

The district court is affirmed. Neither party is entitled to attorney fees on appeal. Costs on appeal are awarded to Amy as the prevailing party.

Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON CONCUR.